IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JUSTIN SPIEHS,

        Plaintiff,

v.                                  Case No.  25-4067-JWB

ERIK SMITH, *et al.*,

        Defendants.

**MEMORANDUM AND ORDER**

This matter is before the court on Defendants' motions to dismiss.  (Docs. 16, 24, 41.)  The motions are fully briefed and ripe for decision.  (Docs. 17, 18, 19, 25, 27, 39, 41, 42, 43.)  The motions are GRANTED IN PART and DENIED IN PART for the reasons stated herein.  Also before the court is Plaintiff's motion for preliminary injunction.  (Doc. 4.)  This motion is also fully briefed.  (Docs. 4, 14, 15.)  As part of its order, the court DENIES the motion as moot. Finally, during the pendency of these motions, Plaintiff moved to amend his complaint.  (Doc. 44.) Defendants filed a response.  (Doc. 45.)  Plaintiff's motion is DENIED.

I.    **Facts**

The following facts are taken from Plaintiff's complaint.  (Doc. 1.)  The court assumes their truth for purposes of the motion.  Plaintiff Justin Spiehs (hereinafter "Plaintiff" or "Dr. Spiehs") is a convert from atheism to Christianity.  (*Id.* at 6.)  Plaintiff is also a "citizen journalist and First Amendment enthusiast and activist."  (*Id.*)  Defendant Erik Smith is the Superintendent of the Kansas Highway Patrol and is sued in his official capacity.  (*Id.* at 27.)  Defendant Adam Proffitt is the Secretary of the Kansas Department of Administration and is sued in his official capacity.  (*Id.*)  Defendants Grady Walker, Stephen Byttner, Bryce Manker, Florencio Chavez,

1

Scott Scheibe, and Darren Canty are all police officers with the Kansas Highway Patrol (collectively "KHP Defendants"). (*Id.* at 27-28.) They are sued in their individual capacities. (*Id.*)

Sometime in early 2025, "satanist Michael Stewart was provided a permit by the [Kansas] Department of Administration under a policy titled 'Usage Policy for Statehouse and Capitol Complex.'" (*Id.* at 8.) The date for the permit was March 28, 2025. (*Id.*) Christian groups organized counterprotests for the same date and time. (*Id.* at 12.) The Foundation for a Christian Civilization and CatholicVote were both granted permits for events on the same day and around the same time. (*Id.*) On March 28, Dr. Spiehs arrived at the Kansas State Capitol with the intention of "peacefully reporting on, as well as observing the event activities and otherwise exercising his rights of assembly and free speech." (*Id.*)

At the March 28 events, Kansas Highway Patrol ("KHP") had separated the events into two groups, placed gated barricades between them, and required individuals to choose which side to be on. (*Id.*) The groups were divided into the "Satan group" and presumably the Christian group. *See* (*id.* at 13.) Dr. Spiehs stood in the Satan group. (*Id.*) He displayed a sign that said, "Bet these pussies won't blaspheme Islam next." (*Id.*) Dr. Spiehs also recorded the event. (*Id.*)

At this juncture, the organizer for the Satan group, Michael Stewart, noticed Plaintiff's sign and yelled at KHP while gesturing to where Plaintiff was standing. (*Id.*) Stewart told officers that Dr. Spiehs should not be standing with the Satan group. (*Id.*) Five officers, including Defendant Chavez, approached Dr. Spiehs and instructed him to choose a side. (*Id.*) Plaintiff stated he intended to remain where he was. (*Id.*) Officers told Dr. Spiehs he was not "with them" (the Satan group) because of what Stewart had indicated to police. (*Id.*) According to KHP, because the Satan group had a permit, Dr. Spiehs could not stand on their side. (*Id.*) Defendant Chavez told Plaintiff he could not remain where he was but that he had three choices "move to one side of the

2

gate, the other side of the gate, or be arrested." (*Id.*) Throughout this interaction, Plaintiff reiterated that he was on public property and that he was exercising his First Amendment rights. (*Id.*) KHP told Plaintiff that it was a "private event." (*Id.*)

An officer then told Dr. Spiehs "let's go" and placed his hand on him. (*Id.* at 14.) Dr. Spiehs then left where he had been standing "under threat of arrest." (*Id.*) Michael Eravi, an individual with Dr. Spiehs who was videotaping the event, was also told to leave. (*Id.*) But officers relented when Eravi told officers "I'm not with him I'm press." (*Id.*)

Plaintiff's complaint then moves to cover another event at the Kansas State Capitol on a different date. An organizer named Christie Peterson applied for a permit for June 14, 2025. (*Id.*) That application was approved. (*Id.*) There were no barriers at this event. (*Id.*) Many individuals at this event carried signs with messages like "Abolish Ice, Let Justice Roll Down Like Waters, No King, or No Kings." (*Id.*) (internal quotation marks omitted). Counter protestors also appeared with "Pro-Trump" messaging. (*Id.* at 15.) Plaintiff stood on the steps of the capitol holding a sign that said "Illegals Drain American Resources" and "Deport Feminist Bitches First then Illegals." (*Id.* at 16.)

Plaintiff alleges the organizer, Christie Peterson, directed KHP officers to remove Dr. Spiehs from the event. (*Id.*) Dr. Spiehs was warned he would be "forcibly removed." (*Id.*) Defendant Walker advised Plaintiff that he needed to move from the stairs to the sidewalk and explained that "they have a permit and you are against their cause so therefore you need to be on the sidewalk or we'll remove you from the property." (*Id.* at 17.) Dr. Spiehs told Defendant Walker that the event organizers do not have control over "this." (*Id.*) Defendant Walker cited the fact that the organizers had a permit as grounds for criminal trespass. (*Id.*) Plaintiff avers he remained non-confrontational with officers during the interaction. (*Id.* at 18.) Defendant Walker

3

told other officers that Plaintiff needed to be removed from the event and directed them to charge him with criminal trespass. (*Id.* at 19.)  Dr. Spiehs was apparently forced to the ground and arrested. *See* (*id.* at 20.)  Dr. Spiehs did not resist arrest as his hands were placed in handcuffs behind his back. (*Id.*)  The officers took Plaintiff's sign. (*Id.* at 21.)

At this point, Plaintiff told the officers that the handcuffs were too tight and causing him pain and numbness. (*Id.*)  Officers refused to adjust them. (*Id.*)  Plaintiff also alleges that Defendant Byttner "unnecessarily kneed Dr. Spiehs multiple times" and Defendant Manker "hit Dr. Spiehs['] back with multiple blows with his forearm." (*Id.*)  Photos incorporated into Plaintiff's complaint show him being led away on foot. (*Id.* at 22.)

Dr. Spiehs was transported to the Shawnee County Jail where he met Officer Canty. (*Id.*) He again advised Defendants that the handcuffs were too tight. (*Id.*)  Defendant Canty told Dr. Spiehs that because of his language toward the officers, the handcuffs would not be adjusted. (*Id.*) Plaintiff was instructed to answer a nurse's questions at the jail. (*Id.*)  The nurse apparently requested that Defendants loosen the handcuffs as they were digging into Plaintiff's wrist. (*Id.* at 23.)  Defendant Byttner replied "Yeah, that [sic] what he kept saying but dude its [sic] been checked twice." (*Id.*)  Dr. Spiehs then called Defendant Byttner "a lying bitch." (*Id.*)  Defendant Canty chimed in saying "if you use that language they won't get untightened." (*Id.*)  Plaintiff also requested his handcuffs be adjusted from behind him to the front. (*Id.*)  Defendants declined to make the adjustment allegedly because of Plaintiff's "attitude." (*Id.* at 23-24.)  Plaintiff requested water, and the officers offered to pour water into Plaintiff's mouth. (*Id.* at 24.)  Dr. Spiehs was given a citation for criminal trespass, released on bond, and given a court appearance. (*Id.*)  One condition of his release was that he was not permitted to return to the Kansas State Capitol. (*Id.*)

4

On July 1, 2025, the Kansas Department of Administration promulgated a new policy ("new Capitol Use Policy" or "post-July 1 Capitol Use Policy") in the wake of these two events. (*Id.* at 24-25.)  According to Plaintiff, the policy establishes, in relevant part:

- All non-legislative meetings, public demonstrations, or outside solicitations in the Statehouse or on its grounds require the prior written approval of the Secretary, or designee, if the organizer desires to reserve a specific space.
- Official public business of the agencies of the State and branches of State Government shall take precedence over any other requested use of areas in the Statehouse and its ground.
- The use of the public areas of the Statehouse and/or its grounds is nonexclusive, so other members of the public have free access to and may use the Statehouse and/or its grounds during the scheduled time of an event.
- No application will be approved if the organization, individual, or individuals submitting the application limit or restrict participation in the event on the basis of race, color, religion, sex (including pregnancy, sexual orientation, and gender identity), age, disability, national origin, or genetic information.
- For security purposes, persons may not wear masks or hoods which conceal the identity of the wearer while in the Statehouse, with the exception or minor children celebrating Halloween, masks worn for health purposes, or necessary religious garb or head coverings.
- No banners, signs, exhibits or any other materials will be taped, tacked, nailed, or hung in any manner within the Statehouse. Banners and signage, as part of the event, may be attached to easels, tables, and/or panels. No person will be allowed to carry hand-held signs, posters, placards, or banners attached to a pole, rod, handle, stick, or post in the Statehouse. Signs or other actions that are obscene, incite violence, or are clearly disruptive are not permitted in the Statehouse. Inaugural banners may be hung inside or outside of the Statehouse as approved by the Secretary or their designee. OFPM will hang all requested banners.
- It shall not be the role of the Kansas Highway Patrol, under the management and supervision of the Superintendent, to enforce the policy, guidelines, and regulations of the Statehouse. However, should the Secretary, or designee, including the Director of OFPM, determine applicable statutes, rules, and/or regulations have been violated, or the conditions set forth in a reservation of Statehouse space have been breached, approval for the event will be revoked and the Kansas Highway Patrol may exercise its law enforcement powers and have the violator removed from the Statehouse, or arrested, if warranted. Further, during any event, the ranking Kansas Highway Patrol official in charge may also revoke approval if continuation of the activity presents an imminent threat to the safety of any person or property.

(*Id.* at 25-26.)  On the same day, Dr. Spiehs applied for a permit to hold an event at the capitol on July 15, 2025.  (*Id.* at 32.)  As explained in Plaintiff's motion for a preliminary injunction, this

5

permit was denied because Plaintiff expressly refused to assent to the new Capitol Use Policy. (Doc. 4 at 4.)

Plaintiff complains that the above actions violated his rights under federal and state law. (Doc. 1 at 28.)  For his troubles, he asserts seven causes of action.  First, he claims that Adam Proffitt and each of the KHP officers violated his Kansas Preservation of Religious Freedom Act rights.  (*Id.*)  Second, he seeks declaratory and injunctive relief against Adam Proffitt and Erik Smith in an as applied challenge to the "prior capitol usage policy" as violating the First Amendment to the United States Constitution.  (*Id.* at 34.)  Third, Plaintiff raises a facial challenge to the new Capitol Use Policy as violating the First Amendment and seeks declaratory and injunctive relief against Adam Proffitt.  (*Id.* at 35.)  Fourth, Plaintiff alleges a violation of the Due Process Clause of the Fourteenth Amendment against all Defendants except Defendant Canty.  (*Id.* at 41.)  Fifth, Plaintiff claims that all the KHP Defendants violated his First Amendment right to freedom of speech through viewpoint discrimination.  (*Id.* at 43.)  Sixth, Plaintiff seeks declaratory relief against all Defendants, apparently asking the court to make clear that Plaintiff's free speech rights at the Kansas State Capitol are unencumbered by any usage policy.  (*Id.* at 46.)  Finally, Plaintiff raises false arrest and excessive force claims against the KHP Defendants.  (*Id.* at 48.)

## II.    Standard

To withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must contain enough allegations of fact to state a claim to relief that is plausible on its face.  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  All well-pleaded facts and the reasonable inferences derived from those facts are viewed in the light most favorable to Plaintiff.  *Archuleta v. Wagner*, 523 F.3d 1278,

1283 (10th Cir. 2008). Conclusory allegations, however, have no bearing upon the court's consideration. *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007).

## III.   Analysis

There are three pending motions to dismiss in this case. To succinctly evaluate the parties' arguments, the court will analyze the motions by count of the complaint and cover the legal arguments made with respect to each person and claim thereunder.

### A.  Count I: Kansas Preservation of Religious Freedom Act

Count I alleges a violation of the Kansas Preservation of Religious Freedom Act ("the Act") by the KHP Defendants and Defendant Proffitt, who is the Secretary of the Kansas Department of Administration. (Doc. 1 at 28.) Proffitt is sued in his official capacity and federal courts cannot entertain suits for money damages against state officials sued in their official capacity. U.S. Const. amend. XI. As a consequence, only injunctive relief is available against Defendant Proffit. The relevant part of the Kansas law in question states:

> (a) Government shall not substantially burden a person's civil right to exercise of religion even if the burden results from a rule of general applicability, unless such government demonstrates, by clear and convincing evidence, that application of the burden to the person:
> > (1)  Is in furtherance of a compelling governmental interest; and
> > (2)  is the least restrictive means of furthering that compelling governmental interest.

K.S.A. § 60-5303(a)(1)-(2). Regarding the KHP Defendants, Plaintiff claims that their actions removing him from the site of two events at the Kansas State Capitol violated his right to free exercise of religion. (*Id.* at 29.) Plaintiff states his exercise of religion was the promotion of his faith through his clothing and "open-air preaching." (*Id.* at 28.) Plaintiff views himself as a "street preacher." (*Id.*) He claims his removal and subsequent ban, as a part of his release on bond, burdened these activities. (*Id.* at 30.)

With regard to Defendant Proffitt, Plaintiff claims that the new Capitol Use Policy "requires Dr. Spiehs to impose no limitations or restrictions to participants in his permitted event based upon 'sexual orientation, gender identity, or genetic information.'" (Doc. 1 at 31.)  Plaintiff argues that this policy would force him to "use or employ people who are not his coreligionists: those who do not share, and who behave in ways antithetical to, his Christian beliefs and messaging."  (*Id.*)  While Plaintiff does not object to having the "identified categories of individuals" present, he complains that the wording of the policy, specifically the use of the word "participate", prevents him from limiting his usage of "vendors, staff, or volunteers" based upon their sexual orientation.  (*Id.* at 31-32.)  Plaintiff explains that allowing "transgender, LGBTQ, or feminist" individuals to participate in his event would violate his religious convictions.  (*Id.* at 32.)  Plaintiff applied for a permit on July 1, 2025, one week before the filing of this lawsuit, to conduct an event on July 15, 2025.  (*Id.* at 32.)  In his motion for a preliminary injunction, Plaintiff asserts that the request was granted subject to his acceptance of the conditions of the post-July 1 Capitol Use Policy.  (Doc. 4 at 4.)  Plaintiff refused to agree to those conditions, so the permit was denied.  (*Id.*)

*1.  KHP Defendants*

The KHP Defendants move to dismiss count I and make two arguments in support.  First, they claim that Plaintiff was not exercising his religion at the time of his two encounters with KHP at the State Capitol.  (Doc. 25 at 4-5.)  Second, they argue that at the March 28, 2025, event, even if Plaintiff was exercising his religion, this exercise was not "burdened" by KHP officers, as the term is used in the Act.  (Doc. 25 at 5.)

Plaintiff responds that the complaint alleges he is a "street preacher" and "preaches his message through signs."  (Doc. 27 at 10.)  He asserts, without authority, that whether his signs

were "religious" is a question of fact that cannot be resolved on a motion to dismiss.  Defendants

dispute this notion. (Doc. 39 at 2.)  The court agrees with Defendants.

The complaint alleges Plaintiff was wearing a t-shirt that said "Rolling with Jesus and my

AK" to each of the events.  (Doc. 1 at 28.)  Further, at the March 28, 2025, event Plaintiff carried

a sign that said, "Bet these pussies won't blaspheme Islam next." (*Id.* at 13.)  At the June 14, 2025,

event, Plaintiff carried a sign that read "Illegals Drain American Resources" and "Deport Feminist

Bitches First then Illegals." (*Id.* at 16.)  No other possible religious expression is identified in the

complaint.  As Defendants argue, this is not religious expression.  (Doc. 25 at 5.)  In response to

Plaintiff's argument that this is a question of fact, Defendants cite several cases where, in the

constitutional context, courts have made this determination as a matter of law.  *See, e.g.*, *Goldstein*

*v. Hochul*, 680 F. Supp. 3d 370, 398 (S.D.N.Y. 2023) (determining in the preliminary injunction

context that a "preference to worship while carrying a firearm is not a religious practice" within

the meaning of the Free Exercise Clause); *Krause v. Tulsa City-County Library Comm'n*, No. 16-

CV-643-JHP-TLW, 2017 WL 337996, at *2 (N.D. Okla. Jan. 23, 2017) (holding in the motion to

dismiss context that environmentalism is merely "personal preferences and secular beliefs" that

"do not warrant the protection of the Free Exercise Clause.").

Signs about immigration policy, much like signs about environmentalism, are not religious

expressions.  Additionally, Plaintiff's sign at the March 28, 2025, event, despite referencing Islam,

is not religious exercise either, as it is merely a sign designed to score a political point about how

society approaches a religion.  Plaintiff has not demonstrated that this is an exercise of his religion.

Finally, Plaintiff's shirt that states he is "Rolling with Jesus and [his] AK" is similarly just a

statement about a religion, not the exercise of a religion.  The remaining allegations of the variety

that Plaintiff is a "street preacher" are conclusory, without detail, and do not establish that at the

9

events in question, Plaintiff was engaged in the exercise of religion.  Accordingly, Plaintiff's removal from those events did not burden his free exercise rights under the Act.  Therefore, the KHP Defendants' motion to dismiss count I of the complaint is granted.

### 2. *Defendant Proffitt*

Defendant Proffitt moves to dismiss on the grounds that Plaintiff has not plausibly alleged a violation of the Kansas Preservation of Religious Freedom Act.  (Doc. 17 at 3-5.)  Defendant Proffitt argues that only if a person or group seeks to reserve a specific space at the Kansas Capitol must an application be filed, a permit issued, and the policy complied with.  (*Id.* at 3-4.)  Defendant Proffitt also disputes that the policy prevents Plaintiff from choosing who may volunteer at his event.  (*Id.* at 4.)  According to Defendant Proffitt, the word "participation" as used in the new Capital Use Policy merely "prohibit[s] event organizers from excluding individuals from taking part in a permitted event based on one of the identified characteristics."  (*Id.* at 4-5.)  In support of its proposition, Defendant cites a Kansas Supreme Court case which, in a different context, defined "participate" as "to have a share in common with others; to take part; to partake."  (*Id.* at 4) (quoting *Smith v. Mut. Ben. Health & Accident Ass'n*, 258 P.2d 993, 996 (Kan. 1953)).  As a result, Defendant Proffitt claims Plaintiff has not alleged a plausible claim under the Act.

For the most part, Plaintiff does not directly respond to these arguments.  Rather, he insists that the Kansas State Capitol is a "traditional public forum."  (Doc. 18 at 4.)  The "forum" analysis is a part of the legal framework undergirding the First Amendment and has nothing to do with the Kansas Act at issue in this portion of the complaint.  *See, e.g.*, *Int'l Soc. For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 674 (1992) ("In this case we consider whether an airport terminal operated by a public authority is a public forum and whether a regulation prohibiting solicitation in the interior of an airport terminal violates the First Amendment.").  Defendant argues

10

that the new policy must only be complied with if a group seeks to reserve a space, otherwise, they can come to the capitol without restriction. (Doc. 17 at 3.) But Plaintiff points to a Kansas Administrative Regulation that provides "No person shall conduct any meeting, demonstration or solicitation on any of the grounds or in any of the buildings listed in K.A.R. 1-49-1 without the prior permission of the secretary of administration or the secretary's designee." K.A.R. 1-49-10. One of the applicable buildings is the capitol. K.A.R. 1-49-1 (a)(1).

In any event, the court grants Defendant Proffitt's motion to dismiss this part of count I for multiple reasons. To the extent Plaintiff seeks injunctive relief against Defendant Proffitt related to the July 1, 2025, permit application, the date of the prospective event (July 15, 2025) has come and gone, and therefore, any claim for injunctive relief is moot.[1] There is no indication in the record that Plaintiff is planning to seek a permit for another event, let alone for the exercise of religion. Plaintiff does assert that he will return to the Capitol. "Dr. Spiehs intends to return to the Capitol Complex and Capitol grounds to engage in protected speech, with or without defendant Proffitt's permit, and return during permitted events by other individuals, including assembly by conducting meetings, protesting, demonstrating, and solicitation of all kinds, which the new Policy prohibits or prohibits without Proffitt's permit." (Doc. 1 at 36.) To the extent the new Capitol Use Policy is applicable to Dr. Spiehs' possible return to the capitol, the court concludes, as explained more fully below in the analysis of count III that the policy's "participation" requirement does not impinge upon the exercise of religion. Moreover, if Dr. Spiehs' future visits to the capitol

---

[1] As this date has come and gone, the court also denies Plaintiff's motion for a preliminary injunction as moot as there is no indication in the record that Plaintiff is planning another event. (Doc. 4.) The court also notes that Plaintiff's motion does not address the factors for a preliminary injunction, and his requested relief is somewhat unclear. To the extent that Plaintiff's motion for preliminary injunction seeks relief outside the July 1, 2025, permit application, that relief is denied because Plaintiff is unlikely to prevail on the merits of his claims given the analysis in the rest of this order.

are like his two prior visits, as explained above, these activities are not part of the exercise of religion at all.

Additionally, any claim for injunctive relief related to the pre-July 1 Capitol Use Policy is moot as well, since that policy has been replaced. *See Bacote v. Fed. Bureau of Prisons*, 119 F.4th 808, 812 (10th Cir. 2024) ("A case becomes constitutionally moot if it ceases to 'present a real and substantial controversy with respect to which specific relief may be fashioned.'") (quoting *Fletcher v. United States*, 116 F.3d 1315, 1321 (10th Cir. 1997)). Accordingly, Defendant Proffitt's motion to dismiss count I is granted.

### B.       Count II: As Applied First Amendment Challenge to The Pre-July 1 Capitol Use Policy

Count II posits that the prior Capitol Use Policy promulgated by the Kansas Department of Administration violated Plaintiff's First Amendment right when it was applied to him at the March 28, 2025, and June 14, 2025, events. (Doc. 1 at 34.)  Despite the complaint not explicitly saying so, the court construes this count as one brought under 42 U.S.C. § 1983.  Plaintiff claims that the policy transformed the capitol complex into private property. (*Id.* at 35.)  This manifested itself when the KHP Defendants removed Plaintiff from the two events, in accordance with directions by the event organizers. (*Id.*)  Plaintiff brings this count against Defendant Proffitt and Defendant Erik Smith, who is the Superintendent of the KHP. (*Id.* at 34.)  They are sued only in their official capacities. (*Id.* at 1.)  Plaintiff claims that Proffitt and Smith "ratified this policy, custom, and practice" and used it to violate Plaintiff's rights. (*Id.* at 35.)

Defendants respond, arguing that this claim is moot, as the policy has been replaced. (Doc. 18 at 5.)  Plaintiff does not argue otherwise, and the court agrees with Defendants.  Given that the policy which Plaintiff challenges has been replaced, any claims for forward-looking injunctive relief are clearly moot. *See Bacote*, 119 F.4th at 812.

12

To the extent Plaintiff seeks declaratory relief about the policy's alleged violations in the First Amendment in the past, the court cannot offer such relief. *Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011) ("[I]n the context of an action for declaratory relief, a plaintiff must be seeking more than a retrospective opinion that he was wrongly harmed by the defendant."). This is for good reason. Article III of the United States Constitution confines the jurisdiction of the federal courts to "cases" and "controversies." U.S. Const. art. III, § 2. Declaratory relief about actions in the past, particularly when there is no showing of possible recurrence, would be tantamount to the issuance of an advisory opinion. *Sosa*, 654 F.3d at 1025 ("[W]hat makes a declaratory judgment action a proper judicial resolution of a case or controversy rather than an advisory opinion is the settling of some dispute which affects the behavior of *the defendant toward the plaintiff*.") (internal quotation marks and citation omitted) (emphasis in original). The federal courts have abhorred such relief since the very beginning of the Republic. Letter from Chief Justice John Jay to President George Washington (Aug. 8, 1793) (on file with the National Archives) ("The Lines of Separation drawn by the Constitution between the three Departments of Government—their being in certain Respects checks on each other—and our being Judges of a court in the last Resort—are Considerations which afford strong arguments against the Propriety of our extrajudicially deciding the questions alluded to[.]"). Therefore, Defendants' motion to dismiss count II of the complaint is granted.

### C.     Count III: Facial First Amendment Challenge to The Post-July 1 Capitol Use Policy

Count III challenges the *new* Kansas Capitol Use Policy as violative of the First Amendment. (Doc. 1 at 35.) Count III is raised against Defendant Proffitt in his official capacity. (*Id.*) In this count, Plaintiff invokes nearly every right protected under the First Amendment. He claims that Defendant Proffitt violated his right to freely exercise his religion, to freely associate

13

with others, and to speak freely without viewpoint discrimination from the government. (*Id.* at 36-38.)  Plaintiff also claims that the new Capitol Use Policy excessively entangles the state government in religion and therefore violates the Establishment Clause of the First Amendment. (*Id.* at 38.)  The court evaluates each First Amendment claim separately.

### 1. *Establishment Clause*

The Establishment Clause of the First Amendment reads "Congress shall make no law respecting an establishment of religion."  U.S. Const. amend I, cl. 1.  The Establishment Clause is "interpreted by 'reference to historical practices and understandings.'"  *Kennedy v. Bremerton School Dist.*, 597 U.S. 507, 535 (2022) (quoting *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 577 (2014)).  A court's inquiry is shaped by determining "whether the [] practice . . . fits within the tradition long followed" in the nation's history.  *See Town of Greece*, 572 U.S. at 577; *see also American Legion v. American Humanist Ass'n*, 588 U.S. 29, 63 (2019) ("Where categories of monuments, symbols, and practices with a longstanding history follow in that tradition, they are likewise constitutional.").  It should also be obvious at this point that the infamous *Lemon* test is now a dead letter.  *Kennedy*, 597 U.S. at 534 ("What the District and the Ninth Circuit overlooked, however, is that the 'shortcomings' associated with this 'ambitiou[s],' abstract, and ahistorical approach to the Establishment Clause became so 'apparent' that this Court long ago abandoned *Lemon* and its endorsement test offshoot.") (internal citations omitted) (modification in original).

With that legal backdrop in mind, the court easily finds that the post-July 1 Capitol Use Policy does not offend the Establishment Clause.  Plaintiff claims that the policy is "excessively entailing [sic]" itself with religion by interfering with Dr. Spiehs "internal decisions about his 'participants' including his volunteers, employees, and vendors" at his possible event.  (Doc. 1 at 38.)  But as Defendants explain, there is nothing in the 2025 policy that requires Plaintiff conduct

his internal affairs in any way that respects an establishment of religion. (Doc. 17 at 8.) The policy's requirement that those hosting events not deny "participation" to others based on their "sexual orientation" cannot plausibly be read as an attempt by the state to involve itself in religion. (Doc. 1 at 53.) Even on Plaintiff's facts, the relevant clause reads like a run of the mill anti-discrimination provision. (*Id.*) This cannot state an Establishment Clause violation.

### 2. *Free Exercise Clause*

The Free Exercise Clause reads "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const. amend I, cl. 2. "[A] plaintiff bears certain burdens to demonstrate an infringement of his rights under the Free Exercise [Clause]." *St. Mary Catholic Parish in Littleton v. Roy*, 154 F.4th 752, 763 (10th Cir. 2025), *cert granted*, No. 25-581, 2026 WL 1052111 (Apr. 20, 2026) (quoting *Kennedy*, 597 U.S. at 524). Even if Plaintiff's free exercise is "burdened" by the Capitol Use Policy, nothing in the Free Exercise Clause "prevent[s] individuals from being subject to a 'valid and neutral law of general applicability' that incidentally conflicts with their religion." *Id.* at 765 (quoting *Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 879 (1990)). Rational basis scrutiny applies if the law in question is neutral and generally applicable. *Id.* The government fails to act neutrally and with general applicability if "it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature", if a law "invite[s] the government to consider particular reasons for a person's conduct by providing a mechanism for individualized exemptions", or if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interest in a similar way." *Id.* at 766 (quoting *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 533-34 (2021) (internal quotation marks omitted) (modification in original)). Such lack of neutrality triggers strict scrutiny. *Id.* at 765. Put simply, "[a] law is neutral so long as its object

15

is something other than the infringement or restriction of religious practices." *Id.* at 766 (quoting *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006) (internal quotation marks omitted)). "Government actions that stem from 'neutral' rules of 'general applicability' are subject to rational basis review, even if the application of the neutral rule 'has the incidental effect of burdening a particular religious practice.'" *Taylor v. Roswell Indep. School Dist.*, 713 F.3d 25, 52 (10th Cir. 2013) (quoting *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993)).

Defendant Proffitt argues that the post-July 1 policy is a neutral and generally applicable law and therefore should be analyzed under rational basis scrutiny. (Doc. 17 at 6.) He contends that Plaintiff has not pointed to any facts that the policy is "religiously motivated." (*Id.* at 7.) In response, Plaintiff points to the policy's requirement that he refrain from restricting participation in his event "on the basis of race, color, religion, sex (including pregnancy, sexual orientation, and gender identity), age, disability, national origin, or genetic information." (Doc. 18 at 1-2.) He says this requirement burdens "the exercise of his religion." (*Id.* at 2.) Specifically, he claims that because acquiescence to the policy would confer "benefits" upon him, the law is a "poison pill" that requires him to either forgo the benefits or violate his religious convictions. (*Id.* at 6) (citing *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017)). Further still, he maintains that the "participation requirement" is not neutral and generally applicable because it apparently "targets" religions that are theologically opposed to "self-declared sexual orientation and gender ideology." (Doc. 18 at 7.) Consequently, Plaintiff seeks the application of strict scrutiny. (*Id.*)

The court agrees with Defendant Proffitt. The law before the court is one that is neutral and generally applicable. The post-July 1st Capitol Use Policy does not "facially target religion"

16

nor is it "established for the purpose of targeting religion" and therefore does not trigger strict scrutiny. *Taylor*, 713 F.3d at 52. The court does not view the word "participation", as used in the policy, as imposing a requirement to hire individuals to whom Plaintiff has a religious objection. The Kansas Supreme Court case cited by Defendant is instructive. (Doc. 17 at 4) (quoting *Smith v. Mut. Ben. Health & Accident Ass'n*, 258 P.2d 993, 996 (Kan. 1953) ("Where the court said 'The verb 'to participate' as defined by Webster means 'to have a share in common with others; to take part; to partake.' There is no implied meaning of contributing effort, nor that one participating is the creator or cause of that in which he participates.")). As the court explained, simply because Plaintiff cannot deny participation to others, it does not follow that those participating are "contributing effort" or are "the creator[s] or cause" of the event in the way that hired staff would be. *See id.* Independent sources the court consulted also counsel this conclusion. *See* PARTCIPATION, Black's Law Dictionary (12th ed. 2024) ("The act of taking part in something, such as a partnership, a crime, or a trial."); PARTICIPATE, American Heritage Dictionary of the English Language (3rd ed. 1996) ("1. To take part in something . . . 2. To share in something."). Viewing the policy against this backdrop leads the court to understand that the policy would prohibit Plaintiff from preventing someone from "taking part" in his event. Taking part in an event, especially one such as a protest or political demonstration, does not imply that those people are hired employees or volunteers for the organizer.

The American Heritage Dictionary source cited above has a helpful illustration in its definition of the word "Participation." PARTICIPATION, American Heritage Dictionary of the English Language (3rd ed. 1996) ("The act of taking part or sharing in something: *Teachers often encourage class participation.*") (emphasis in original). As law students well know, teachers do often encourage class participation. And teachers are considered the organizers of their class. So,

when teachers encourage students to "participate" in their classes no ordinary speaker of English would understand them to be inviting their students to help organize or run the class. That job falls to the teacher alone, despite student participation in class. The same is true of Plaintiff here. If Plaintiff is an event organizer, he may not deny participation to others. This does not mean those participating in the event are co-organizers with Plaintiff or that Plaintiff is forced to employ them or use them as volunteers. To understand otherwise would be to strain the English language and this court declines to do so.[2] *Cf. Niz-Chavez v. Garland*, 593 U.S. 155, 163 (2021) ("But until and unless someone points to evidence suggesting otherwise, affected individuals and courts alike are entitled to assume statutory terms bear their ordinary meaning. And when it comes to discerning the ordinary meaning of words, there are perhaps few better places to start than the rules governing their usage.") (emphasis added).

Plaintiff argues in his preliminary injunction briefing that this reading renders other language in the policy superfluous (Doc. 15 at 4-5) (referencing Doc. 4-3 at 2) ("The use of the public areas of the Statehouse and/or its grounds is nonexclusive, so other members of the public have free access to and may use the Statehouse and/or its grounds during the scheduled time of an event."). But, given what Plaintiff pled in his complaint, this argument is untenable, as his complaint implicitly recognizes the difference between this provision and the participation requirement. *See* (Doc. 1 at 31) ("Dr. Spiehs has no problem whatsoever in having all of the identified categories of individuals the Secretary has listed attend the Capitol Complex during his

---

[2] Were Plaintiff's interpretation of the word "participation" correct, the policy would be far more likely to present serious constitutional infirmities. *See Union Gospel Mission of Yakima Washington v. Brown*, 162 F.4th 1190, 1197 (9th Cir. 2026) ("Under the church autonomy doctrine, Union Gospel may decline to hire as non-ministerial employees those who do not share its religious beliefs about marriage and sexuality."); *id.* at 1204 ("Indeed, if a religious organization were forced to hire those who flout and disregard its religious beliefs, it may forgo engagement with the public in the first place. *See Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094, 1096 (Alito, J., respecting the denial of certiorari) ('To force religious organizations to hire messengers and other personnel who do not share their religious views would undermine not only the autonomy of many religious organizations but also their continued viability.').").

event. In fact, Dr. Spiehs welcomes it as a way to make his messaging known."). The two provisions are not superfluous. One indicates that the capitol complex as a whole will remain open to the public during a permitted event. The other indicates that a permitted event may not limit participation in the event based on the protected characteristics. These provisions are not superfluous.

Because of this, Plaintiff's claim that the policy "targets" religion is conclusory and unfounded. (Doc. 18 at 7.) Plaintiff's analogizing of this case to *Trinity Lutheran* is misplaced. While, as explained above, Plaintiff attempts to make this out as a benefits case, *Trinity Lutheran* is easily distinguishable. For one, in *Trinity Lutheran*, the court reviewed the law under strict scrutiny because state law outright conditioned the conferral of the benefits at issue on an institution being non-religious. 582 U.S. at 455. Second, *Trinity Lutheran* involved conferral of a clear benefit: monetary reimbursement grants. *Id.* at 454. Here, Plaintiff claims that the new Capitol Use Policy also confers benefits, but it is less clear that, for example, the "[r]eservation of a space . . . inside or outside the Capitol Complex" is the kind of governmental benefit that implicates the First Amendment. (Doc. 18 at 5, n. 2.) After all, nothing about this benefit forces Plaintiff "to a [forbidden] choice: [he] may participate in an otherwise available benefit program or remain a religious [person]." *Trinity Lutheran*, 582 U.S. at 462.

The Capitol Use Policy applies to all who seek to reserve part of the capitol. (Doc. 1 at 52.) It does not expressly burden the free exercise of religion nor is it apparently motivated to target religion. At most, it has an "incidental" impact on the free exercise of religion. *Taylor*, 713 F.3d at 52. It is therefore subject to rational basis review. *Id.* Preventing discrimination in this manner, particularly when the forum of possible discrimination is imbued with the backdrop

19

or specter of the state, is rationally related to a legitimate government interest.    Therefore, Plaintiff's free exercise claim regarding the post-July 1 policy must be dismissed.

### 3. Freedom of Speech Clause

Plaintiff also asserts that his rights arising under the First Amendment's Freedom of Speech Clause are violated by the new Capitol Use Policy.  (Doc. 1 at 36, 38-40.)  Further, Plaintiff claims that Kansas Administrative Regulations violate the First Amendment by prohibiting the posting of "notices or petitions" or conducting a "meeting, demonstration or solicitation" without permission from the state.   K.A.R. § 1-49-10.   This along with the new Capitol Use Policy's limitation preventing "non-legislative meetings" without a permit apparently empowers the state to "arbitrarily decide the content of speech" and therefore burdens the First Amendment right.  (Doc. 1 at 39.)  Even during permitted events, the policy prohibits the "distribution of 'leaflets' and 'handouts.'"  (*Id.* at 40.)  Plaintiff contends all of this is unconstitutional and that various parts of the regulations and the post-July 1 Capitol Use Policy are unconstitutionally vague.  (*Id.*)

Defendant responds that the permitting process employed by the State of Kansas to administer the capitol grounds easily survives constitutional scrutiny.  (Doc. 17 at 9-15.)  He also asserts that the policy and administrative regulations that Plaintiff challenges as vague are anything but.  (*Id.* at 15.)  Here, the court mostly agrees with Defendant.

### a. Permitting Requirements

For Plaintiff to "demonstrate a violation of [his] First Amendment rights, [he] must first establish that [his] activities are protected by the First Amendment." *Verlo v. Martinez*, 820 F.3d 1113, 1128 (10th Cir. 2016).  If they are, the inquiry progresses to ask "whether the challenged restrictions impact a public or nonpublic forum, because that determination dictates the extent to which the government can restrict First Amendment activities within the forum." *Id.*  Then, a

20

reviewing court "must determine whether the proffered justifications for prohibiting speech in the forum satisfy the requisite standard of review." *Id.* The court assumes for the purposes of this order that Plaintiff's activities at the State Capitol would be protected by the First Amendment. Here, Defendant has conceded for the purpose of this order that the capitol is a "traditional public forum." (Doc. 19 at 5.) Therefore, the court moves on to assess whether the justifications for the alleged prohibitions are constitutionally permissible.

"Permitting schemes are necessary to ensure that scarce space is allocated among conflicting applicants, to protect public access to thoroughfare and public facilities, and to enable police, fire, and other public safety officials to function." *Utah Animal Rights Coalition v. Salt Lake City Corp.*, 371 F.3d 1248, 1258 (10th Cir. 2004). Reasonable regulations that "govern[] the use of public property for free expression" are therefore not inconsistent with the First Amendment. *Id.* (citing *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941)). The Supreme Court has a line of cases that shape the limits of state power in this arena. *See Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002). As applied by the Tenth Circuit, "a content-neutral time, place, and manner regulation is constitutional provided that it contains 'adequate standards to guide the official's decision and render it subject to judicial review.'" *Utah Animal Rights Coalition*, 371 F.3d at 1259 (quoting *Thomas*, 534 U.S. at 323); *see also Verlo*, 820 F.3d at 1134 ("But even in a public forum, the government can restrict speech through "content-neutral time, place, and manner restrictions that: (a) serve a significant government interest; (b) are narrowly tailored to advance that interest; and (c) leave open ample alternative channels of communication.").

Therefore, the Tenth Circuit instructs the court to begin by determining if the regulation and the new Capitol Use Policy are content-neutral. *Utah Animal Rights Coalition*, 371 F.3d at 1260. "[T]he principal inquiry in determining content neutrality ... is whether the government has

21

adopted a regulation of speech because of disagreement with the message it conveys." *Id.* (quoting

*Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal quotation marks omitted)

(modification in original)).  The Kansas Administrative Regulation that Plaintiff challenges is

content neutral.  KAR § 1-49-10 reads:

> No person shall post any notices or petitions upon any of the grounds or in any of the public areas of the buildings listed in K.A.R. 1-49-1, except on the bulletin board of an agency when the consent of the agency has been secured. No person shall conduct any meeting, demonstration or solicitation on any of the grounds or in any of the buildings listed in K.A.R. 1-49-1 without the prior permission of the secretary of administration or the secretary's designee.

This regulation is not tethered to the content of any speech.  It makes no reference to the content

of any speech.  It also plainly applies to anyone by using the words "no person."  K.A.R. § 1-49-

10.  "An animal rights group receives precisely the same consideration as a pro-life demonstration,

a religious vigil, or a pep rally for the local basketball team."  *Utah Animal Rights Coalition*, 371

F.3d at 1260.

As to the Capitol Use Policy itself, Plaintiff takes issue with the statement that "[a]ll non-

legislative meetings, public demonstrations, or outside solicitations in the Statehouse or on its

grounds require the prior written approval of the Secretary, or designee, if the organizer desires to

reserve a specific space."  (Doc. 1 at 52.)  This too is a content neutral regulation as it makes no

reference to the content or viewpoint of any particular person or group.  The policy does differ in

one important respect from the KAR as it does not apply to everyone; it only applies to people that

seek "to reserve a specific space."  (*Id.*)  This carveout is wholly benign and content neutral.  The

phrase "non-legislative meetings" does not, as Plaintiff attempts to argue, pertain to the content of

speech but rather to the character of the meetings at the capitol.  (*Id.*)  It is plain that the phrase

"non-legislative meetings" intends to demarcate a line between the activities of the general public

22

and those affiliated with the activities of the legislative branch. This is not a content-based regulation.

Since the court has determined that the policy and the regulation are content neutral it moves to ask, "whether the regulations [and policy]: 1) possess adequate standards to guide the exercise of official discretion and make possible meaningful judicial review; and 2) are narrowly tailored to a significant state interest while leaving open satisfactory alternative means of communication." *Utah Animal Rights Coalition*, 371 F.3d at 1260 (citing *Thomas*, 534 U.S. at 323); *see also Verlo*, 820 F.3d at 1134. Plaintiff insists that the policy and regulation are content-based and, regardless, are subject to strict scrutiny. (Doc. 18 at 4-5, 9.) As explained above, this is wrong. Plaintiff does not address the test for content-neutral regulations, and the court finds Defendant's volunteered justification for the new Capitol Use Policy satisfies constitutional scrutiny. First, Plaintiff does not appear to dispute that there are "adequate standards" to guide the exercise of official discretion; it is not argued in his response to the motion to dismiss. No missing standards are obvious to the court. On the second prong, Defendant's asserted interest in managing competing claims to the limited space at the capitol is certainly a significant interest. (Doc. 17 at 12-14.) The capitol is a secure facility, with limited space on the property, and it is far from unreasonable for the government to ask those *who seek to reserve a specific space* to acquire a permit. The permitting process does not appear to be overly broad or burdensome and therefore it is narrowly tailored. Additionally, there are ample avenues for alternative communications, including simply not reserving a space which avoids application of the Capitol Use Policy altogether. (Doc. 1 at 52.) For these reasons the court holds that the new Capitol Use Policy does not violate the First Amendment.

But still, Plaintiff contends that while the Capitol Use Policy only applies to those "desir[ing] to reserve a specific space" the Kansas Administrative Regulation's prohibition on "meeting[s], demonstration[s] or solicitation[s]" without a permit, applies to everyone. (Doc. 18 at 10-11.) Plaintiff contends that this regulation also violates the First Amendment. (*Id.*) Defendant responds that the "specific" (the policy) should control over the more "general" (the regulation). (Doc. 19 at 6, n. 2.)

Here, the court agrees with Plaintiff. While Plaintiff's challenge to the new Capitol Use Policy must fail, his challenge to KAR § 1-49-10 can proceed because the regulation plainly sweeps in anyone who wishes to use the capitol grounds at all. This means the regulation is not narrowly tailored because its application to everyone (even those not seeking to reserve a specific space) does not *narrowly* serve the government's asserted interest in managing "competing claims to the same space." (Doc. 17 at 13.) *See Verlo*, 820 F.3d at 1134. Because the regulation applies even when there are no reservations for a specific space, it applies when there are no competing claims to the capitol grounds. Therefore, in theory, a person or group who simply wants to meet on the lawns or steps of the capitol even for very small or informal purposes must seek prior approval from the state. *See Cole v. Goossen*, 402 F. Supp. 3d 992, 1007 (D. Kan. 2019) (holding regarding the same regulation, for standing purposes that "[w]hile the Court agrees that the context of the usage policy and its applications to 'events' may ultimately be found to not apply to the activity Plaintiffs want to engage in, the plain language of this regulation does apply to 'any' demonstration, and the permitting rules of the usage policy would thus seem to be applicable, at least as judged by the deferential standard at this stage of the litigation.").

Other courts have frowned upon similar regulations as overbroad, and this court agrees. *See Harcz v. Boucher*, 763 F. App'x 536, 542-43 (6th Cir. 2019) (holding that excluding

24

individuals from an event open to the public on state capitol grounds supported a First Amendment claim because as pled, there were no "crowd control and public safety" rationales justifying the exclusion); *JXN Undivided Coalition v. Tindell*, 771 F. Supp. 3d 872, 877 (S.D. Miss. 2025) (granting a preliminary injunction enjoining a Mississippi law prohibiting events on sidewalks surrounding government buildings without prior written approval); *World Wide Street Preachers' Fellowship v. City of Grand Rapids*, No. 07-CV-57, 2007 WL 1462130, at *5 (W.D. Mich. May 16, 2007) (describing how courts have invalidated permit schemes that "potentially apply to small groups" as "overly broad and lack[ing] narrow tailoring") (collecting cases); *Wirtshafter v. Trustees of Indiana Univ.*, 784 F. Supp. 3d 1091, 1105-06 (S.D. Ind. 2025) (similar) (collecting cases).

Defendant's attempt to avoid this conclusion by asserting that the more specific policy should control over the more general regulation is misguided.  (Doc. 19 at 6, n. 2.)  Plaintiff is bound by the policy if he seeks to reserve a specific space and is bound by the regulation even if he does not seek to reserve a specific space or if an application for a space is denied.  Plaintiff challenges both the policy and the regulation here.  (Doc. 1 at 38-39.)  Accordingly, this is not a case where the specific prevails over the general but one where only one of the two asserted constitutional challenges may proceed.

### b. Vagueness

To prevail on an overbreadth and vagueness claim in a civil case,[3] Plaintiff must show that the apparently vague law "reaches a substantial amount of constitutionally protected conduct" and if it does that "the enactment is impermissibly vague in *all* of its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982) (emphasis added).  Here

---

[3] The Supreme Court has distinguished between a more permissive vagueness standard in civil cases and a more exacting one in criminal cases and alien removal proceedings. *Sessions v. Dimaya*, 584 U.S. 148, 156-157 (2018).

though, Plaintiff is a little vague in his own assertions and has therefore utterly failed to carry his burden.  The terms that Plaintiff challenges, as Defendant points out, are a mixture of easily understood English nouns and terms that are frequently used in law, including in statutes.  *See* (Doc. 17 at 15.)  None of these words or phrases are obviously vague to the court, and Plaintiff provides little to no argument supporting his vagueness claims.  *See generally* (Doc. 18.) Therefore, Plaintiff's challenges cannot survive.

### 4.  *Freedom of Association*

Lastly, Plaintiff claims that the new Capitol Use Policy violates the right, implied by the First Amendment and recognized by the Supreme Court, that individuals may associate with other individuals of their choice.  (Doc. 1 at 37.)  Plaintiff argues again that the "participation" requirement in the new Capitol Use Policy requires him to hire employees he does not wish to associate with.  (*Id.* at 39.)  Defendant Proffitt resists this and denies that the policy requires any such thing. (Doc. 17 at 8.)  Defendant Proffitt also denies that the new Capitol Use Policy requires Plaintiff to forcibly associate with individuals he does not wish to.  (*Id.*)  Instead, Defendant submits the policy only prohibits discrimination.  (*Id.*)

In support of his argument, Defendant analogizes to two Supreme Court cases that deal with "forced association."  (*Id.*)  First, he cites *Boy Scouts of America v. Dale*, 530 U.S. 640, 653 (2000), a case which struck down an antidiscrimination law that required the scouts to hire a gay scoutmaster.  The court feared that "Dale's presence in the Boy Scouts would, at the very least, force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior."  *Id.*  Defendant contrasts that case with *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 626 (1994) where the court upheld a statute requiring cable television to dedicate a portion of their programming to local

channels.  In part, the Court held that "[g]iven cable's long history of serving as a conduit for broadcast signals, there appears little risk that cable viewers would assume that the broadcast stations carried on a cable system convey ideas or messages endorsed by the cable operator." *Id.* at 655.  Defendant then points to Plaintiff's own activities, such as protesting against satanists while standing among them, as evidence that there is "little risk that outside viewers would assume the message of any individual attendee is endorsed by the event organizer." (Doc. 17 at 8-9.)

The court agrees with Defendant.  The seminal case outlining the contours of the associational right is *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984).  In that case the court explained that there were several ways a government might infringe this right.  *Id.* at 622-23 ("Among other things, government may seek to impose penalties or withhold benefits from individuals because of their membership in a disfavored group, it may attempt to require disclosure of the fact of membership in a group seeking anonymity, and it may try to interfere with the internal organization or affairs of the group.") (internal citations omitted).  Plaintiff's allegations tend toward the final kind of infringement: "interfere[nce] with the internal organization or affairs of the group." *Id.* But Plaintiff's claim that the new Capitol Use Policy enables such government interference with his event is unfounded and expressly disclaimed by Defendant. (Doc. 17 at 8.)  Other than claiming that the word "participation" requires hiring individuals he does not wish to hire (which the court has already rejected), Plaintiff does not point to anything that indicates the new Capitol Use Policy in any way interferes in his group's internal affairs.  Moreover, as Defendant points out, Plaintiff is no stranger to attending protests as a counter-protestor.  *See generally* (Doc. 1.)  Therefore, the court is not persuaded that the state has at all burdened Plaintiff's associational rights.  For those reasons, Plaintiff's freedom of association claim is dismissed.

> **D.      Count IV: Procedural Due Process Challenge to the Capitol Use Policies**

Count IV again challenges the Capitol Use Policies, but it is cast in terms of a Due Process Clause violation under the Fourteenth Amendment.  (Doc. 1 at 41.)  It is levied against all Defendants in this action, except Defendant Canty.  (*Id.*)  The court construes the count as alleging that the Capitol Use Policies entitled Defendants to deprive Plaintiff of a liberty interest without due process of law.  (*Id.* at 41-43.)  More specifically, Plaintiff contends that he had a liberty interest in being present at the Kansas State Capitol that was deprived without due process of law due to the policies.  (*Id.* at 42.)  The court addresses the arguments on motions to dismiss by each group of Defendants.

The Fourteenth Amendment provides that no state shall, "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  Claims made under the Due Process Clause are brought through 42 U.S.C. § 1983.  *Moore v. Board of Cnty. Com'rs of Cnty. of Leavenworth*, 507 F.3d 1257, 1259 (10th Cir. 2007).  The court "examine[s] procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Id.* (quoting *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (internal quotation marks omitted)).

### 1.  *Defendants Adam Proffitt and Erik Smith*

As Defendants argue, Plaintiff's challenge to the pre-July 1 Capitol Use Policy is moot. Defendants Proffitt and Smith are sued in their official capacity.  (Doc. 1 at 1, 41.)  Plaintiff's only possible relief is therefore injunctive, which is prospective.  *Shaw v. Smith*, 166 F.4th 61, 78 (10th Cir. 2026) ("Under the *Ex parte Young* exception to Eleventh Amendment immunity, a plaintiff may sue state officials in their official capacities to obtain equitable relief against the state.").  But, as explained above, because the pre-July 1 policy has been replaced, no forward-looking relief can

28

be had, and Defendant's due process challenge to the pre-July 1 Capitol Use Policy is moot. *See Bacote*, 119 F.4th at 812.

By contrast, on the post-July 1 Capitol Use Policy, Defendants argue that Plaintiff has not adequately established that he has a protected liberty interest in "access to the Capitol grounds." (Doc. 17 at 16.) Defendants cite case law to support this proposition, and Plaintiff does not respond to Defendants' arguments. (Doc. 19 at 2.) They also argue that on Plaintiff's own allegations, he has access to the State Capitol under the new policy and therefore whatever liberty interest he has is unburdened. (*Id.*)

The court agrees with Defendants. First, nothing in Plaintiff's allegations establishes that he is somehow deprived of access to the State Capitol.[4] As Defendants repeatedly point out, Plaintiff is free to access the statehouse without being subject to the rules and regulations of the new Capitol Use Policy. (Doc. 1 at 52.) So, Plaintiff must show not just that he has a liberty interest in access to the capitol, but that he has a liberty interest in holding an event on State Capitol grounds free from regulation by the state. Plaintiff has identified no authority demonstrating such an interest. Defendants, by contrast, have directed the court to multiple sources of at least somewhat analogous authority showing that individuals may not have a cognizable interest in access to government facilities. *See e.g.*, *Doe v. City of Lafayette*, 377 F.3d 757, 770-71 (7th Cir. 2004) (holding that a convicted sex offender could be banned from all public parks in the City of Lafayette); *Souders v. Lucero*, 196 F.3d 1040, 1046 (9th Cir. 1999) (holding that a person accused of stalking could be banned from Oregon State University's campus as the defendant could not "establish[] a constitutionally protected liberty interest in having access to the University."); *Chafin v. Stasi*, No. 13-CV-02661-WYD-MEH, 2015 WL 1525542, at \*11 (D. Colo. Mar. 31,

---

[4] As Plaintiff's criminal case has been dismissed (Doc. 44.), he is no longer barred from returning to the capitol under the terms of his release on bond.

2015) (holding that a temporary restriction on a person's access to a public facility due to a protection order "does not implicate a liberty interest."). The court notes that the capitol comes closer to implicating a liberty interest than the examples in the cases cited by Defendants, because of the capitol's inherent importance to political expression. Even still, Plaintiff *can* access the capitol grounds, and this court is skeptical of the proposition that a liberty interest is implicated when a state government places regulations on holding events at state government buildings.

### 2. KHP Defendants

Count IV is also aimed at the KHP Defendants, sued in their individual capacities, who effected Plaintiff's arrest. (Doc. 1 at 41.) Here, Count IV relates to Plaintiff's arrest at the June 14, 2025, event at the State Capitol. (*Id.*) The KHP Defendants argue the claim against them fails for the same reason as Defendants Proffitt and Smith: Plaintiff has failed to establish a liberty or property interest in access to the State Capitol. (Doc. 25 at 6.)

Plaintiff's allegation here is slightly different however, as it refers to his actual removal from the State Capitol on June 14, 2025. (Doc. 1 at 41, 43.) The court still agrees with Defendants. Plaintiff was not prohibited from being at the State Capitol. (*Id.* at 17.) The KHP Defendants attempted to move Plaintiff from the capitol steps to the sidewalk below due to a permitted protest. (*Id.*) The KHP Defendants warned Plaintiff he would be subject to criminal trespass charges if he failed to move. (*Id.*) Plaintiff failed to move, and it is at this point that he was arrested. (*Id.* at 19.) The court is skeptical of such a liberty interest, but Plaintiff's claim fails for another independent reason.

On these facts, Plaintiff would have to establish that he was deprived of appropriate process when police officers still arrested him for criminal trespass, even when he believed that the underlying basis for the arrest violated the First Amendment. The court is doubtful of this

proposition, particularly in the due process context raised here.  In essence, Plaintiff is attempting to interject his First Amendment claims (addressed more fully below) into a due process claim. The Supreme Court has bristled at this sort of constitutional creativity.  *Cf. Graham v. Connor*, 490 U.S. 386, 395 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.").   If the Supreme Court believes recasting textual rights claims as substantive due process claims is improper, casting them as procedural due process claims is even more outlandish.   For other practical reasons the court is disinclined to allow this approach. Consider what Plaintiff asserts.  Plaintiff is arguing, solely because he believes that the basis for his arrest violated the First Amendment, that duly authorized state law enforcement officers infringed his due process rights when they effected that arrest.  (Doc. 1 at 41.)  This cannot be.  It would be wholly impractical to entitle arrestees to due process at the scene of arrest.  A magistrate cannot ride shotgun with each police officer prepared to preside over an impromptu probable cause hearing at the scene each time the officer makes an arrest.  The only due process Plaintiff was entitled to at the scene of arrest was the officers' reasonable consideration of the law and facts applicable to the situation before them.  *Cf. Virginia v. Moore*, 553 U.S. 164, 171 (2008) ("In a long line of cases, we have said that when an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt. The arrest is constitutionally reasonable.").  More thorough due process is afforded *after* arrest, firstly at a probable cause hearing.   *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975) ("Accordingly, we hold that the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest.").

31

Plaintiff has again cited no authority demonstrating an entitlement otherwise or rebutting the above analysis. Therefore, his claim cannot proceed. Due to the foregoing, Defendants' motion to dismiss as to count IV is granted.

### E.      Count V: First Amendment Viewpoint Discrimination and Retaliation

Count V claims that the KHP Defendants violated Plaintiff's First Amendment rights in two different ways. First, Plaintiff says the KHP Defendants engaged in prohibited viewpoint discrimination when they removed him from the State Capitol. (Doc. 1 at 44-45.) Specifically, Plaintiff believes that the KHP Defendants were instructed "that if an event coordinator or applicant wanted an individual removed that KHP should enforce that." (*Id.*) Second, Plaintiff claims he was arrested in retaliation for his speech. (*Id.* at 44.) Third, he alleges that Defendants Canty and Byttner specifically retaliated against him for exercising his free speech rights when they refused to loosen his handcuffs which were causing him pain and injury. (*Id.* at 43-44.) Defendants Canty and Byttner, according to Plaintiff, "leveraged the pain and injury being inflicted upon Dr. Spiehs in order to elicit responses to questions[.]" (*Id.* at 43.)

The KHP Defendants reply that Plaintiff has failed to overcome their qualified immunity defense. (Doc. 25 at 2.) Defendant Canty also argues that Plaintiff's complaint fails to state a claim. (Doc. 41 at 2.) The court addresses each of Plaintiff's theories in turn.

*1.  Viewpoint Discrimination and Retaliatory Arrest Claims*

"Qualified immunity 'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Callahan v. Unified Gov't of Wyandotte Cnty.*, 806 F.3d 1022, 1026 (10th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Once qualified immunity is invoked by Defendants "the plaintiff bears the burden to demonstrate that

32

[(1)] the defendant violated his constitutional rights and [(2)] that the right was clearly established." *Id.* at 1027. Defendants primarily contend that Plaintiff has failed to "show the law was clearly established[.]" (Doc. 39 at 3.) The court agrees.

Even assuming *arguendo* that Plaintiff has pled sufficient factual matter to make out a violation of his constitutional rights, as Defendants point out, he defines the right at far too high a level of generality, saying only that it is clearly established that the capitol is a traditional public forum. (Doc. 27 at 12.) The Supreme Court and the Tenth Circuit have repeatedly reproved courts taking this approach, as it risks eliminating the effect of the qualified immunity defense altogether. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) ("We have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (internal citation omitted); *Frasier v. Evans*, 992 F.3d 1003, 1014 (10th Cir. 2021) ("Typically, the precedent must have clearly established the right in light of the specific context of the case, not as a broad general proposition.") (internal quotation marks and citation omitted) (collecting cases). Within this setting, the court declines to adopt the Plaintiff's approach and instead starts atop a veritable heap of Supreme Court and Tenth Circuit instruction.

To demonstrate that the right at issue is clearly established, Plaintiff "must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Frasier*, 992 F.3d at 1014 (quoting *Cox v. Wilson*, 971 F.3d 1159, 1171 (2020) (internal quotation marks omitted)). Courts though, "do not require a case directly on point, but existing precedent [nonetheless] must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *al-Kidd*, 563 U.S. at 741 (internal quotation marks omitted) (modification in original)). The "unlawfulness must be apparent", *id.* at 1015, and the "rule's contours must be so well defined that it is 'clear to a

33

reasonable officer that his conduct was unlawful in the situation he confronted.'" *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Ultimately, this is a specific inquiry; the "legal principle [must] clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* "Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Id.* at 64 (quoting *Brosseau v. Haugen,* 543 U.S. 194, 199 (2004)). This is not such a case.

Here Plaintiff's allegations would require a showing that it was clearly established law that police officers may not direct a peaceful protestor to a slightly different location to maintain separation between opposing groups of protestors for the purpose of maintaining order or the exclusivity of a permitted event. Plaintiff's arrest, based on his own allegations, occurred because he ignored repeated directions from police officers to move. (Doc. 1 at 17.) The cases Plaintiff points to in his brief are not cases indicating that the KHP Defendants should have known their conduct was unlawful. *See Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 133-34 (1992) (holding that a variable fee charged for a parade permit based upon the expected security costs is unconstitutional); *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 806 (1985) (holding that government employers may "exercise control over access to the federal workplace" so long as the distinctions are reasonable and viewpoint neutral); *United States v. Grace*, 461 U.S. 171, 177-179 (1983) (holding that a statute flatly prohibiting the distribution of leaflets or display of flags on the sidewalks outside the United States Supreme Court was unconstitutional); *United State Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 133 (1981) (holding that while legislatures cannot "*ipse dixit*" destroy the public forum status of streets and parks, a statute requiring that mail placed in a mailbox have paid postage was not

34

analogous and was therefore constitutional); *First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*, 308 F.3d 1114, 1131 (10th Cir. 2002) (holding that Salt Lake City could not both retain a pedestrian easement over part of a street and permit the Mormon Church to ban speech activities on the land); *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1254-58 (10th Cir. 2005) (holding that land entirely conveyed to the Mormon church was no longer a public forum); *Occupy Columbia v. Haley*, 738 F.3d 107, 124-25 (4th Cir. 2013) (holding that qualified immunity did not apply because it was clearly established that arresting citizens protesting on state capitol grounds "in the absence of a valid, time, place, and manner restriction" was a violation of the First Amendment); *ACLU of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1100-01 (9th Cir. 2003) (holding that a pedestrian street mall in Las Vegas was a traditional public forum); *Lederman v. United States*, 291 F.3d 36, 44 (D.C. Cir. 2002) (holding that the sidewalk around the United States Capitol was a traditional public forum).

As a reader can see, the cases cited by Plaintiff are considerably distinguishable and represent an attempt to define the law at a level of generality unacceptable under Supreme Court precedent. Additionally, Plaintiff cannot, as he attempts to do, transform the qualified immunity analysis into one where it becomes Defendants' responsibility to identify similar case law. (Doc. 27 at 8-9.) That is Plaintiff's burden, and he has not carried it. Even still, Defendants produced some cases analogous to the situation here. *See Saved Magazine v. Spokane Police Dep't*, 19 F.4th 1193, 1200 (9th Cir. 2021) ("A reasonable person in Officer Doe's position could have concluded that the Constitution permitted his relatively modest efforts to prevent Yaghtin from provoking counterprotestors in their designated zone, even if his actions involved restricting Yaghtin's speech."); *Kroll v. United States Capitol Police*, 847 F.2d 899, 903 (D.C. Cir. 1988) ("In light of the state of First Amendment law in 1980, the five officers in 1980 could reasonably have

35

concluded that the very existence of a permit system carried with it the principle of exclusivity. Judgments about the message being conveyed by a particular demonstrator, a reasonable officer could have concluded, are inherent in the implementation of a permit system.").

The court has also found support in cases that are not factually identical to the instant one but nonetheless convey that the officers' request for Plaintiff to move was a content-neutral response that a reasonable officer would believe is lawful. *See, e.g.*, *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 574 (1995) ("Even if this view gives the Council credit for a more considered judgment than it actively made, the Council clearly decided to exclude a message it did not like from the communication it chose to make, and that is enough to invoke its right as a private speaker to shape its expression by speaking on one subject while remaining silent on another."); *Sistrunk v. City of Strongsville*, 99 F.3d 194, 199 (6th Cir. 1996) ("To require that the organizers include buttons and signs for Bill Clinton in the demonstration would alter the message the organizers sent to the media and other observers, even if the holders of signs and wearers of buttons did not otherwise interfere with the pro-Bush rally."); *Startzell v. City of Philadelphia, Pennsylvania*, 533 F.3d 183, 201 (3d Cir. 2008) ("In the context of OutFest, which had received a permit to hold its event and engage vendors to sell their wares, the fact that the police asked Appellants rather than the Pink Angels to move was a content-neutral response to the interference caused by Appellants' actions and loud speech with the permitted event's activities."). Based on the foregoing analysis, Plaintiff cannot defeat Defendants' assertion of qualified immunity as to his viewpoint discrimination or retaliatory arrest claims.

### 2. Retaliation Claim Against Defendants Canty and Byttner

As explained above, Plaintiff also alleges that Defendants Byttner and Canty retaliated against him for exercising his freedom of speech when they refused to loosen the handcuffs or

36

move his hands. (Doc. 1 at 43-44.) Defendant Canty argues in his motion to dismiss that there is no factual allegation that shows Defendant Canty refused to loosen the handcuffs with "retaliatory animus" towards Plaintiff's speech. (Doc. 41 at 3.)

A First Amendment retaliation claim is distinct from a claim for a "direct" First Amendment violation. *Zorn v. City of Marion*, 774 F. Supp. 3d 1279, 1324 (D. Kan. 2025). Plaintiff's "First Amendment retaliation claim relies on defendants' *response* to plaintiff engaging in protected First Amendment activities." *Id.* (emphasis in original). To adequately allege a First Amendment retaliation claim Plaintiff must plead that "(a) he or she was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (c) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Van Deelen v. Johnson*, 497 F.3d 1151, 1155-56 (10th Cir. 2007). The Supreme Court has emphasized that the third prong requires "a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 259 (2006)). "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* at 398-99 (emphasis in original).

The court agrees with Defendants that Plaintiff has not carried the causation burden. While Plaintiff does allege that he was "engaged in protected First Amendment activities" and that Defendants Canty and Byttner "caused . . . injury that would chill a person of ordinary firmness from continuing to engage in that activity" he has failed to link the two. *Van Deelen*, 497 F.3d

1155-56.  Other than a conclusory statement that Defendant Canty "leveraged the pain and injury being inflicted upon Dr. Spiehs . . . because of Dr. Spiehs being non-responsive (as he had a right to do) and then because Dr. Spiehs called the officers names", there are limited allegations that support the notion that Canty and Byttner's refusal to adjust the handcuffs was "retaliatory animus" and the "but-for" cause of Plaintiff's injuries.  (Doc. 1 at 43); *Nieves*, 587 U.S. at 398-99.  Without more than bare legal conclusions, Plaintiff's allegations for retaliation against Defendants Canty and Byttner cannot proceed.  Count V is dismissed.

### F.  Count VI: Declaratory Relief

Plaintiff's count VI seeks a declaratory judgment against all Defendants "for all the reasons stated in Counts 1 & 2."  (Doc. 1 at 46.)  As explained above, counts I and II are dismissed for failure to state a claim.  Therefore, on Plaintiff's own complaint count VI must be dismissed as well; the court cannot maintain a claim for declaratory relief as a standalone cause of action.  *Long v. Wells Fargo Bank, N.A.*, 670 F. App'x 670, 671-72 (Mem) (10th Cir. 2016) (citing *Schilling v. Rogers*, 363 U.S. 666, 677 (1960)).

### G.  Count VII: False Arrest and Excessive Force Claims

Count VII advances claims against all KHP Defendants for "False Arrest" and "Excessive Force."  (Doc. 1 at 48.)  Plaintiff alleges there was "no reason to use force upon" him and there was "no probable cause to arrest" him for trespass.  (*Id.*)  He argues that the force used, wrestling him to the ground, was unnecessary since he "was cooperating."  (*Id.*)  Particularly, Plaintiff claims that Defendant Byttner unnecessarily kneed him several times while Defendant Manker hit him with his forearm.  (*Id.* at 49.)  Plaintiff again raises his claim that Defendants Canty and Byttner purposefully maintained handcuffs that were too tight to force him to comply.  (*Id.*)

Defendants invoke qualified immunity in response to the false arrest claims. (Doc. 25 at 14.) According to Defendants, a false arrest claim is defeated on qualified immunity grounds if on Plaintiff's pleaded facts, the officers had "arguable" probable cause. (*Id.*) Additionally, Defendants argue the force used, as alleged by Plaintiff, is "reasonable" within the meaning of the Fourth Amendment. (*Id.* at 14-15.) The court evaluates each defense in turn.

### 1. False Arrest

"In the context of a false arrest claim, an arrestee's constitutional rights were violated if the arresting officer acted in the absence of probable cause that the person had committed a crime." *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012). This inquiry is intertwined with the other prong of the qualified immunity analysis which requires a showing that "it would have been clear to a reasonable officer that probable cause was lacking under the circumstances...." *Id.* (quoting *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011)). "As a practical matter, [courts] implement this standard by asking whether there was 'arguable probable cause' for an arrest—if there was, a defendant is entitled to qualified immunity." *Id.* (quoting *Cortez v. McCauley*, 748 F.3d 1108, 1121 (10th Cir. 2007) (en banc)).

In this posture, the court can only dismiss the claims against Defendants on qualified immunity grounds if the facts, as pled by Plaintiff, indicate that "a reasonable officer" would have had "probable cause . . . under the circumstances." *See id.* As the Tenth Circuit has explained, "false arrest" is a quintessentially state law claim that can only be intelligible with reference to the state law from which it emanates. *Id.* at 1300-01. Defendants are "claim[ing] to have had probable cause based on a state criminal statute." *Id.* at 1301. Therefore, the "precise scope" of Plaintiff's right to be free from "false arrest" necessarily "depends on the contours of a state's substantive criminal law." *Id.*

Defendants argue two independent grounds for probable cause to arrest Plaintiff: criminal trespass and interference with law enforcement.  (Doc. 25 at 8-12.)  Indeed, this is confirmed in Plaintiff's complaint where it indicates his criminal citation was for "two offenses—Criminal Trespass under K.S.A. 21-5808 and Interference with LEO under K.S.A. 21-5904."  (Doc. 1 at 24.)  The court first examines the two statutes.  In Kansas, criminal trespass is defined in relevant part as follows:

> (a) Criminal trespass is entering or remaining upon or in any:
> (1) Land, nonnavigable body of water, structure, vehicle, aircraft or watercraft by a person who knows such person is not authorized or privileged to do so, and:
> (A)    Such person enters or remains therein in defiance of an order not to enter or to leave such premises or property personally communicated to such person by the owner thereof or other authorized person;

K.S.A. § 21-5808 (a)(1)(A).  Interference with law enforcement is defined in relevant part as:

> knowingly obstructing, resisting or opposing any person authorized by law to serve process in the service or execution or in the attempt to serve or execute any writ, warrant, process or order of a court, or in the discharge of any official duty; or

K.S.A. § 21-5904 (a)(3).  Based on the facts pled in Plaintiff's complaint, Defendants had probable cause to arrest Plaintiff for violations of both statutes.  The criminal trespass statute is unambiguous and straightforwardly prohibits a person from "remaining" on "land" when the person "knows such person is not authorized or privileged to do so" and that person "remains therein in defiance of an order . . . to leave . . . personally communicated by" an "authorized person."  Plaintiff explains in his complaint that Defendant Walker told him he needed "to move out to the sidewalk."  (Doc. 1 at 17.)  He was warned if he refused to move, he would be cited for criminal trespass.  (*Id.*) Plaintiff admits that he remained where he was after officers directed him to move saying he "remain[ed] calm keeping his position the same never confronting the officers but remained stationary."  (*Id.* at 18.)  As pled, under K.S.A. § 21-5808(a)(1)(A) this is sufficient to establish probable cause to arrest Plaintiff for criminal trespass.

The same facts support at least "arguable" probable cause to arrest Plaintiff for interference with law enforcement. *See Higgs*, 697 F.3d at 1300. As explained above, Plaintiff defied an order of law enforcement that was at least arguably lawful and therefore he could be arrested under the interference with law enforcement statute. Defendants produce significant case law supporting such a holding. *See United States v. Mosley*, 743 F.3d 1317, 1330 (10th Cir. 2014) ("Defendant's failure to comply with this lawful order gave the officers probable cause to arrest him at least for the Kansas criminal offense of 'interference with law enforcement.'"); *Eravi v. City Comm'n of Lawrence, Kansas*, 24-4042-DDC, 2025 WL 918201, at *8 (D. Kan. Mar. 26, 2025) ("This dialogue establishes McShane gave lawful orders, attempting to remove plaintiff from the area because he was interfering with police officers' efforts to perform their duties. And plaintiff didn't comply. Plaintiff's disobedience provides probable cause to arrest plaintiff for interference."). Taken together, this is more than enough to defeat Plaintiff's false arrest claims.

### 2. *Excessive Force*

Defendants also argue that Plaintiff fails to state a claim for excessive force. (Doc. 25 at 14-16.) "An excessive force claim 'must ... be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized excessive force standard.'" *Stevenson v. City of Albuquerque*, 446 F. Supp. 3d 806, 857 (D.N.M. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989) (internal quotation marks omitted)). That standard is "reasonableness." *Id.* The "proper application" of the reasonableness standard requires a totality of the circumstances approach which takes into account "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The "reasonableness" is adjudged objectively, from the "perspective of a reasonable officer on the

41

scene." *Id.* "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers', violates the Fourth Amendment." *Id.* (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

The Tenth Circuit has applied this standard in many cases. Defendants point to several that, even on Plaintiff's facts, support their motion to dismiss. The court mostly agrees with Defendants. For starters, a claim of excessive force by way of wrist restraints requires a showing of "actual injury that is not de minimis." *Koch v. City of Del City*, 660 F.3d 1228, 1247 (10th Cir. 2011) (holding that photographs and "hospital reports classifying complaint as 'some sores on her wrists and arms'" was insufficient to show her injuries from handcuff application were more than "de minimis."). An "actual injury" showing is required because "handcuffing itself is not necessarily an excessive use of force in connection with an arrest, a plaintiff must show actual injury in order to prove that the officer used excessive force in the course of applying handcuffs." *Donahue v. Wihongi*, 948 F.3d 1177, 1197, n. 29 (10th Cir. 2020) (quoting *Fisher v. City of Las Cruces*, 584 F.3d 888, 897 (10th Cir. 2009) (internal quotation marks omitted)). "Limited, temporary" ailments that "le[ave] no substantial injury" are insufficient allegations to plead excessive force. *McGregor v. City of Neodesha, Kansas*, No. 22-1033-EFM, 2022 WL 6728149, at *5 (D. Kan. Oct. 11, 2022). The Tenth Circuit has also held in the context of an automobile stop that "pulling . . . using pressure points, and twisting his wrist and arm" is permissible. *Valencia v. De Luca*, 612 F. App'x 512, 519 (10th Cir. 2015). The court characterized this force as "minimal in comparison with more drastic techniques such as the use of pepper spray, tasers, or batons." *Id.*

Put simply, the use of force must be more substantial and result in an injury that is more than mere "superficial abrasions." *Koch*, 660 F.3d at 1248. Courts have repeatedly distinguished

42

between things like "permanent nerve injury" and mere "red marks from handcuffs that were visible for days afterward." *Donahue*, 948 F.3d at 1197 (comparing *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1209 (10th Cir. 2008) with *McCauley*, 478 F.3d at 1129).

With this guidance in mind the court moves to scrutinize Plaintiff's excessive force allegations which generally fall into two camps: the application of and refusal to loosen the handcuffs by Defendants Canty and Byttner and blows landed with knees and forearms by Defendants Manker and Byttner during his arrest. The court addresses each in turn.

First, as pled, Plaintiff has failed to allege more than a de minimis injury when it comes to the handcuffs. *Koch*, 660 F.3d at 1247. Plaintiff alleges he repeatedly told "officers the handcuffs were too tight and causing a great amount of pain and numbness." (Doc. 1 at 21-22.) When he arrived at the Shawnee County Jail, he repeated this. (*Id.* at 22.) When the jail nurse asked Defendant Byttner to loosen the handcuffs because they were "digging into his wrists", Byttner apparently retorted "[y]eah, that [sic] what he kept saying but dude its [sic] been checked twice." (*Id.* at 23.) Plaintiff alleges they had not been "checked twice." (*Id.*) Plaintiff also alleges Defendants refused to move his handcuffs from behind him to the front, like other inmates. (*Id.*) Later in his complaint, but not within his excessive force claim, Plaintiff alleges that he asked Canty to loosen the cuffs because "it was drawing blood, his hands were numb and turning blue." (Doc. 1 at 43.) As shown by the cases above, these are "de minimis" injuries. If hospital records and photographs showing sores on wrists aren't enough for the Tenth Circuit on summary judgment, this court is skeptical that allegations of a similar nature are enough to survive a motion to dismiss. *See Koch*, 660 F.3d at 1247. Plaintiff's allegations also stand in contrast to other cases where the court found "long-lasting nerve injury." *Mglej v. Garnder*, 974 F.3d 1151, 1169 (10th Cir. 2020); *Vondrak*, 535 F.3d at 1209. In *Scott v. City of Albuquerque*, the circuit rejected a claim

43

where a Plaintiff testified that "his wrists 'were bruised and swollen' for 'about a week' after the arrest" and that "'he had redness, soreness, and indentations' on his wrists." 711 F. App'x 871, 881 (10th Cir. 2017). "This [was] not enough to show a constitutional violation." *Id.* In short, "[h]andcuffing inevitably involves some use of force, and it almost inevitably will result in some irritation, minor injury, or discomfort where the handcuffs are applied." *United States v. Rodella*, 804 F.3d 1317, 1328 (10th Cir. 2015) (quoting *Chambers v. Pennycock*, 641 F.3d 898, 907 (8th Cir. 2015)).

Plaintiff's primary rebuttal to this notion is that the cases offered by Defendants are cases in which a lawful arrest occurred, Plaintiff maintains one has not occurred here, and so the theory goes, no level of force was appropriate.[5] (Doc. 27 at 11.) But as the court previously explained, officers had probable cause to arrest Dr. Spiehs.[6] Plaintiff goes on to argue that cases have "held that ignoring complaints of painfully tight handcuffs violates clearly established law." (Doc. 42 at 3.) But this extraordinarily general reading of the case law is too reductionist to control the court's opinion here. Accordingly, Plaintiff's excessive force claim based on the application of handcuffs must fail.

Second, the court will allow Plaintiff's excessive force complaint against Defendants Byttner and Manker to move forward as he alleges that they unnecessarily kneed him and struck

---

[5] Defendants point out to the court that three cases cited and quoted by Plaintiff in support of this proposition are defective as the quotes used in Plaintiff's brief are not present in the cited cases. (Doc. 39 at 6.) The court has confirmed this contention. The court strongly suspects this is a product of the use of artificial intelligence, given that a Westlaw search for these precise quotes turned up no exact results. While the court declines to enter a show cause order at this time, Plaintiff's counsel is strongly warned that the any further incorrect quotations could result in sanctions under Fed. R. Civ. P. 11 and D. Kan. Standing Order No. 26-01.

[6] Moreover, based on a case Defendants cite, it seems Plaintiff's recitation of the law is untrue. In fact, just because probable cause does not exist at the time of arrest does not automatically make out a claim for excessive force. *McCauley*, 478 F.3d at 1126 ("Thus, in a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force.").

44

him with their forearms. (Doc. 1 at 21.) Defendants argue that Plaintiff cannot show more than a de minimis injury here (Doc. 25 at 15-16), but the de minimis injury standard does not apply to non-handcuffing claims for excessive force. *Rodella*, 804 F.3d at 1328-29 ("In light of the authorities discussed above, we reject the central premise of Rodella's argument, i.e., that there is a de minimis injury requirement for Fourth Amendment excessive force claims in cases which involve more than handcuffing."). Therefore, the court's analysis is cabined to the factors outlined in *Graham*: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. As alleged, all three *Graham* factors favor Plaintiff. Plaintiff has alleged that he was arrested for criminal trespass and interference with law enforcement. (Doc. 1 at 24.) These are relatively minor crimes and are both misdemeanors under the statutes as applied here. K.S.A. § 21-5808 (b); K.S.A. § 21-5904 (b). Second and third, Plaintiff pleads that he did not resist arrest, nor attempt to flee, nor take any action directed toward another person. (Doc. 1 at 18, 20). With all of the *Graham* factors weighing in his favor, there is little on the officers' side of the *Graham* balancing test that demonstrates they needed to hit Plaintiff repeatedly to effectuate the government's interest in arrest. 490 U.S. at 396 ("Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."). At this stage, Plaintiff's excessive force claim relating to blows landed by Defendant Byttner and Manker may proceed.

### H.      Motion to Amend

During the pendency of the motions to dismiss, Plaintiff filed a motion to amend his complaint, solely to add a new cause of action for malicious prosecution. (Doc. 44 at 2.) Plaintiff's

basis for his motion was that the criminal case against him was dismissed on the motion of the Kansas government for "insufficient evidence." (Doc. 44-2 at 2.) The Federal Rules of Civil Procedure only permit amendments to pleadings at this stage with leave of the court or consent of the parties. Fed. R. Civ. P. 15 (a). Leave to amend should only be denied upon "a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Wilkerson v. Shinseki*, 606 F.3d 1256, 1267 (10th Cir. 2010) (quoting *Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1315 (10th Cir. 2005) (internal quotation marks omitted)).

On March 30, 2026, Magistrate Judge Brooks Severson entered a Report & Recommendation ("R&R") recommending the motion to amend be denied. (Doc. 46.) Plaintiff had fourteen days from entry of the R&R to lodge objections to the magistrate judge's conclusion. (*Id.*) He has not timely filed objections. His failure to timely object to any portion of the R&R leaves him with no entitlement to appellate review. *Williams v. United States*, No. 19-2476-JAR-JPO, 2019 WL 6167514, at *1 (D. Kan. Nov. 20, 2019) ("The Tenth Circuit requires that objections to a magistrate judge's recommended disposition 'be both timely and specific to preserve an issue for de novo review by the district court ...") (quoting *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996)). "In the absence of timely objection, the district court may review a magistrate's report under any standard it deems appropriate." *Summers v. Utah*, 927 F.2d 1165, 1167 (10th Cir. 1991) (citing *Thomas v. Arn*, 474 U.S. 140, 150 (1985) (stating that "[i]t does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings.")). Accordingly, the court reviews the R&R under a clear error standard and agrees with the magistrate judge's conclusion.

46

Plaintiff seeks to add a cause of action for malicious prosecution to his complaint.  (Doc. 44 at 2.)  Malicious prosecution raised under the Fourth Amendment through 42 U.S.C. § 1983 requires that "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the arrest, confinement, or prosecution; (4) the defendant acted maliciously; and (5) the plaintiff sustained damages." *Shrum v. Cooke*, 60 F.4th 1304, 1310 (10th Cir. 2023) (emphasis removed) (citing *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008), *abrogated on other grounds by Thompson v. Clark*, 596 U.S. 36 (2022)).

The magistrate judge determined that Plaintiff failed to adequately allege causation because courts have held that "the chain of causation is broken by an indictment, absent an allegation of pressure or influence exerted by the police officers, or knowing misstatements made by the officers to the prosecutor."  (Doc. 46 at 5) (quoting *Shrum*, 60 F.4th at 1312).  Given that the "proposed amended pleading does not allege that either Defendant Walker or Defendant Byttner filed the charge against" Plaintiff, pressured the prosecutors, or made misstatements to induce prosecution, the court sees no reason to disagree with this conclusion.  (Doc. 46 at 6-7.)

But even assuming that Plaintiff could adequately plead that Defendants caused his confinement Plaintiff's new allegations still fail.  The proposed amended complaint woefully fails to demonstrate the third and fourth elements of malicious prosecution: that no probable cause supported the arrest and malice.

Plaintiff claims that there was no probable cause to support his arrest because the criminal case was dismissed for insufficient evidence.  (Doc. 44 at 2.)  At the outset, were this correct, it would collapse two elements of malicious prosecution into one another in any case brought because of dismissal for lack of evidence.  More importantly however, simply because a case is

47

dismissed (especially as here on motion of the prosecution) for lack of evidence, does not mean that the arresting officers did not have probable cause. *See Sodaro v. City and Cnty. of Denver*, 753 F. Supp. 3d 1224, 1236 (D. Colo. 2024) ("At the outset, the Court notes that the relevant probable cause determination for a § 1983 plaintiff asserting malicious prosecution following a warrantless arrest is the one 'made during the constitutionally-required probable cause hearing, which must occur *after* the initial warrantless arrest.'") (emphasis in original) (quoting *Sanchez v. Hartley*, 810 F.3d 750, 757 (10th Cir. 2016)); *Thompson*, 596 U.S. 36, 53 (Alito, J., dissenting) ("Second, since a malicious-prosecution claim does not require a seizure, it obviously does not require proof that the person bringing suit was seized without probable cause. The claim *does* demand proof that the person bringing suit was *prosecuted* without probable cause, but probable cause at the time of arrest is a different question from probable cause at the time at which a prosecution is initiated.") (emphasis in original). Moreover, the mere dismissal (on the state's own motion) of a case because it did not have enough evidence to proceed to trial is not a finding on whether the arresting officers had probable cause. *See* (Doc. 44-2 at 2) ("on the oral application of the State of Kansas").

Plaintiff's new allegations added to his proposed amended complaint also wholly fail to demonstrate malice. Plaintiff claims that Defendants' "malice is established directly by the facts set forth in the arresting officer's own probable cause affidavit, which reveals that the sole basis for identifying Dr. Spiehs as a person to be removed was a private citizen's objection to the content of his sign—a sign bearing a political message." (Doc. 44-3 at 50.) But Plaintiff's new allegations are contrary to his prior allegations, which asserted an event organizer informed law enforcement that Plaintiff was not permitted to be present in a particular area of the capitol grounds, which the event organizer had reserved. (Doc. 1 at 17.) On Plaintiff's original complaint, it is his refusal to

48

move to "the sidewalk" that resulted in his arrest. (*Id.*) Additionally, he now claims that "no[] person authorized to act on behalf of the State of Kansas, ever communicated to Dr. Spiehs that he was not authorized to be present." (Doc. 44-3 at 50.) But the original complaint posits that Defendant Walker, a KHP officer, told him he needed to move. (Doc. 1 at 17.) This hardly shows malice.

Perhaps most importantly, it is (admittedly so) Plaintiff's refusal to move to the sidewalk that precipitated his arrest. (*Id.*) Plaintiff's insistence that the officers had First Amendment law wrong did not entitle him to refuse their direction to move. *Cf. United States v. United Mine Workers of America*, 330 U.S. 258, 308-309 (1947) (Frankfurter, J., concurring) ("So strongly were the framers of the Constitution bent on securing a reign of law that they endowed the judicial office with extraordinary safeguards and prestige. *No one,* no matter how exalted his public office *or how righteous his private motive, can be judge in his own case. That is what courts are for.*") (emphasis added). Because "[i]t is the proud boast of our democracy that we have a 'government of laws and not of men'", *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting) (citation omitted), individuals are not at liberty to adjudicate for themselves the contours of the law and thereunder refuse the orders of law enforcement without consequence. *See, e.g.*, K.S.A. § 21-5904 (a)(3). *Cf. United States v. Cunningham*, 509 F.2d 961, 963 (D.C. Cir. 1975) ("Federal officers engaged in good faith and colorable performance of their duty may not be forcibly resisted, even if the resistor turns out to be correct that the resisted actions should not in fact have been taken.") (citing cases); *Lundahl v. Halabi*, 600 F. App'x 596, 605 (10th Cir. 2014) ("It is a basic proposition that all orders and judgments of courts must be obeyed 'however erroneous the action of the court may be,' until the order 'is reversed by orderly review, either by itself or by a higher

49

court' and that 'disobedience of them is contempt of [the court's] lawful authority, to be punished.'") (quoting *Howat v. Kansas*, 258 U.S. 181, 189-90 (1922) (modification in original)).

Were individuals faced with a police order empowered to act as an impromptu judge and jury and summarily decide what is lawful, American society would descend into lawlessness and anarchy. *United Mine Workers of America*, 330 U.S. at 312 (Frankfurter, J., concurring) ("If one man can be allowed to determine for himself what is law, every man can. That means first chaos, then tyranny."). Courts should not cosign such a notion. *Id.* at 308 ("But from their own experience and their deep reading in history, the Founders knew that Law alone saves a society from being rent by internecine strife or ruled by mere brute power however disguised.") (internal quotation marks and citation omitted). Instead, the public, police, and courts alike are governed by law as applied by the judiciary, that body of persons who are set apart "to be the depositories of law, who by their disciplined training and character and by withdrawal from the usual temptations of private interest may reasonably be expected to be as free, impartial, and independent as the lot of humanity will admit." *Id.* (internal quotation marks omitted).

Plaintiff's attempt to shoehorn his broader First Amendment claims against the KHP Defendants, already rejected in this order, into a malicious prosecution claim cannot lie. All Plaintiff had to do was comply with a benign order from police and he would have avoided arrest and prosecution altogether. And then he could have brought this lawsuit challenging the order to move as a violation of his rights. *Id.* at 311 ("The most prized liberties themselves pre-suppose an independent judiciary through which these liberties may be, as they often have been, vindicated. When in a real controversy, such as is now here, an appeal is made to law, the issue must be left to the judgment of courts and not the personal judgment of one of the parties."). What Plaintiff

cannot now do is convert his legally dubious decision to refuse an order of law enforcement into a claim for malicious prosecution. Plaintiff's motion to amend is denied.

## IV.    Conclusion

To summarize, what remains of Plaintiff's case is twofold. First, a narrow piece of his count III remains; it alleges a violation of his First Amendment freedom of speech rights by K.A.R. § 1-49-10 as administered by Defendant Adam Proffitt in his official capacity. (Doc. 1 at 35-41.) Second, Plaintiff's count VII Fourth Amendment excessive force claims against Defendants Byttner and Manker, for their striking of Plaintiff during his arrest, may proceed. (*Id.* at 48-49.) The remaining counts and the following Defendants are dismissed in their entirety: Erik Smith, Grady Walker, Florencio Chavez, Scott Scheibe, and Darren Canty. For the foregoing reasons, Defendant Canty's motion to dismiss (Doc. 41) is GRANTED and the motions to dismiss by the remaining Defendants (Docs. 16, 24) are GRANTED IN PART and DENIED IN PART. Additionally, Plaintiff's motion for a preliminary injunction is DENIED as moot. (Doc. 4.) Plaintiff's motion to amend his complaint is DENIED. (Doc. 44.)

IT IS SO ORDERED. Dated this 29th day of April, 2026.


s/ John W. Broomes
JOHN W. BROOMES
CHIEF UNITED STATES DISTRICT JUDGE

51