**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**Justin Spiehs**

PLAINTIFF

v.

**Erik Smith,** *in his official capacity* as Superintendent of the Kansas Highway Patrol
*
**Adam C. Proffitt,** *in his official capacity* as Secretary of the Kansas Department of Administration
*
**Grady Walker,** *in his individual capacity* as Lieutenant for the Kansas Highway Patrol
*
**Stephen M. Byttner,** *in his individual capacity* as Officer for Kansas Highway Patrol
*
**Bryce Manker,** *in his individual capacity* as Officer for Kansas Highway Patrol

**Florencio Chavez,** *in his individual capacity* as Officer for Kansas Highway Patrol

**Scott Scheibe,** *in his individual capacity* as Officer for Kansas Highway Patrol

DEFENDANTS

Case No. 25-4067-JWB-BGS

Jury Trial Requested

# FIRST AMENDED COMPLAINT

## Jurisdiction and Venue

This Court has subject-matter jurisdiction over Counts II through XI under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4). The Court has supplemental jurisdiction over Count I under 28 U.S.C. § 1367(a). Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in Shawnee County, Kansas, within this judicial district.

## COUNT I

### Kansas Preservation of Religious Freedom Act
### Substantial Burden on Religious Exercise
### Against All Defendants Not Named Proffitt and Smith

1. This Count is directed only to defendants Walker, Byttner, Manker, Chavez, and Scheibe. At all relevant times, Defendants acted under color of law and constituted "government" within the meaning of K.S.A. 60-5302(e). Plaintiff Justin Spiehs is a Christian. Before converting to Christianity, Dr. Spiehs identified as an atheist. Dr. Spiehs sincerely believes that God created mankind male and female, that Christ is the ultimate authority over civil government, that human beings are accountable to God, and that sex, family, public morality, and human identity are governed by God's created order.

2. Dr. Spiehs sincerely believes that feminism, sexual-identity ideology, rejection of biological sex, public celebration of sexual disorder, and satanic religious expression are contrary to Christian doctrine, Christian ethics, and God's created order. Dr. Spiehs sincerely believes that Christian faith requires more than private belief. He believes Christians are called to proclaim truth publicly, warn publicly, rebuke public moral error, and bear witness where public moral or religious error is advocated, celebrated, or publicly displayed.

3. Dr. Spiehs's religious practice includes public religious witness, open-air preaching, sign-based proclamation, public dialogue, recording, publication, and confrontation of public messages he believes are contrary to Christian truth. Dr. Spiehs's method of religious expression is intentionally direct, public, and

confrontational. He believes religious warning and rebuke need not be polite, clergy-led, institutional, or confined to church property to constitute religious exercise.

4. Before March 28, 2025, Dr. Spiehs had repeatedly engaged in public religious witness and open-air preaching in Kansas by using signs, expressive clothing, public speech, recorded encounters, and public commentary to communicate Christian moral messages. He alleges that his March 28 and June 14, 2025 Capitol conduct was substantially motivated by sincerely held Christian beliefs and by his religious practice of public witness and public rebuke. Dr. Spiehs's religious exercise included not only speaking and displaying signs in person, but also recording and later publishing his public witness so that his religious message and the governmental response to that message could reach a broader audience.

**Pre-July Permit-Holder Exclusion Practice and KHP Notice**

5. At the time of the June 14, 2025 event, no Department policy, guidance, instruction, training, or written administrative practice authorized a permit holder to request the removal, relocation, or exclusion of counter-speakers, protestors, demonstrators, nonparticipants, or persons expressing disagreement with the permit holder's message. At that time no Department policy, guidance, instruction, training, or written administrative practice instructed KHP officers to remove or relocate a person from public Capitol grounds merely because the person opposed the permit holder's message.

6. At that time no Department policy, guidance, instruction, training, or written administrative practice authorized KHP officers to treat a Capitol event permit as

granting the permit holder private control over who could remain in public areas near or within the approved event area and no Department policy, guidance, instruction, training, or written administrative practice authorized KHP officers to convert a permit holder's objection to a counter-speaker into a trespass command.

7. During that time no Department determination barred members of the public, nonparticipants, counter-speakers, or persons opposing the event's message from being present in or near the approved event area and no Department determination barred Dr. Spiehs from being present in or near the approved event area because he opposed the permit holder's message.

8. No Department official, OFPM official, Secretary's designee, or other Department decisionmaker determined that: (1) Dr. Spiehs violated K.A.R. 1-49-10 on June 14, 2025; (2) Dr. Spiehs violated a June 14 permit condition; (3) Dr. Spiehs lacked required permission to stand silently on the Capitol steps with his sign; (4) Dr. Spiehs needed his own permit to attend, observe, record, or engage in religious or political counter-witness at the June 14 event; (5) Dr. Spiehs stood outside a lawful public-access area; and (6) Dr. Spiehs was subject to removal, relocation, exclusion, or arrest.

9. The June 14 permit issued did not: (1) grant the permit holder exclusive control over public access to the Capitol steps or grounds; (2) authorize the permit holder to exclude persons who opposed the permit holder's cause; (3) authorize the permit holder to convert disagreement with the event's message into grounds for police removal; and (4) identify Dr. Spiehs as a person barred from the event area, barred from the Capitol steps, or barred from public Capitol grounds.

10. No Department-recognized request, complaint, objection, or determination authorized Dr. Spiehs's removal because of his signs, viewpoint, opposition to the event, religious message, or counter-witness. Walker's order that Dr. Spiehs leave because the event organizer had a permit and because Dr. Spiehs was "against their cause" was not based on any Department determination that Dr. Spiehs violated K.A.R. 1-49-10, violated a permit condition, lacked required permission, needed his own permit, stood outside a public-access area, or was subject to removal or relocation. Walker's order was not based on any written Department policy authorizing private permit holders to exclude counter-speakers or persons who disagreed with the permit holder's message from public Capitol grounds.

11. KHP officers applied an unwritten permit-holder exclusion practice under which a private organizer's objection to Dr. Spiehs's religiously motivated counter-witness was converted into a State command enforceable by removal, arrest, and criminal-trespass consequences. That unwritten permit-holder exclusion practice caused or contributed to the burdens, seizures, arrest, sign confiscation, prosecution-related restrictions, and access restrictions alleged in this Complaint. That unwritten permit-holder exclusion practice is relevant to Plaintiff's KPRFA, Free Exercise, Free Speech, viewpoint-discrimination, unlawful-arrest, malicious-prosecution, and excessive-force claims because the removal order supplied the asserted predicate for the later seizure, arrest, force, prosecution, bond restrictions, and exclusion from Capitol access.

12. Before July 2025, KHP applied an existing permit-holder exclusion practice under which private event organizers could cause KHP officers to remove religious counter-witnesses from public Capitol areas when the counter-witness opposed the organizer's message. Chavez applied that practice on March 28, and Walker applied it again on June 14. Before June 14, KHP had or should have had notice of the March 28 enforcement practice through body-camera footage, incident reports, supervisory review, complaints, emails, or other records reflecting that officers had treated a permitted Capitol event as private and had enforced a permit-holder objection against Dr. Spiehs's religious counter-witness.

**March 28, 2025 Religious Counter-Witness**

13. On March 28, 2025, Dr. Spiehs attended the Capitol event because it involved satanic religious expression at the Kansas State Capitol. Dr. Spiehs sincerely believed that satanic religious expression at the seat of Kansas government should not go unanswered by Christian counter-witness. Dr. Spiehs attended the March 28 event to oppose satanic religious expression, to bear Christian witness, to confront what he regarded as spiritual and moral error, and to communicate religious opposition to blasphemy and anti-Christian hostility.

14. On March 28, Dr. Spiehs stood silently in the area KHP had designated for the satanic group while displaying a sign stating, "Bet these pussies won't blaspheme Islam next." Dr. Spiehs used the word "blaspheme" deliberately. The sign was intended to communicate a religious message about blasphemy, selective hostility toward Christianity, unequal public treatment of religions, and public tolerance of

anti-Christian or satanic expression. Dr. Spiehs intended the March 28 sign to expose what he sincerely believed to be a public double standard: that public actors freely mock Christianity or tolerate satanic expression directed against Christian beliefs while treating other religions differently.

15. The religious nature of Dr. Spiehs's March 28 expression was apparent from the circumstances, including the satanic nature of the permitted event, the religious language of his sign, his physical placement at the event, and the nature of his counter-witness.

16. Event organizer Michael Stewart objected to Dr. Spiehs after seeing Dr. Spiehs and his sign. KHP officers then confronted Dr. Spiehs and told him he was "not with them." Defendant Chavez told Dr. Spiehs that the permit meant "only people they want in there are allowed there," that the event was "private," and that Dr. Spiehs would be arrested for trespassing if he remained. Defendant Chavez and other KHP officers forced Dr. Spiehs from the area where he was engaged in religious counter-witness and prevented him from continuing to communicate his religious message to the audience he intended to reach.

17. Defendant Chavez and the assisting officers thereby constrained, inhibited, curtailed, and denied Dr. Spiehs's religious exercise and excluded him from access to Capitol grounds where he was engaged in religious counter-witness. Defendant Chavez and the assisting officers also curtailed Dr. Spiehs's religious practice of recording and publication by interrupting his continued ability to record, document,

and later publish his religious counter-witness from the place where he intended to continue that witness.

**June 14, 2025 Religious Witness**

18. On June 14, 2025, Dr. Spiehs attended the Capitol event to engage in public religious and moral witness concerning Christ's authority, civil authority, created sexual order, feminism, immigration, public morality, and national responsibility. Dr. Spiehs's June 14 message was substantially motivated by his sincerely held Christian belief that Christ, not the State or any political movement, is ultimate authority.

19. Dr. Spiehs's June 14 message was also substantially motivated by his sincerely held Christian belief that God created men and women with distinct created identity, moral order, and purpose. Dr. Spiehs sincerely believes that feminism and modern ideologies rejecting biological sex conflict with God's created order and should be publicly opposed. On June 14, Dr. Spiehs stood silently on the Capitol steps holding a sign. One side of the sign stated "Illegals Drain American Resources." The other side stated "Deport Feminist Bitches First then Illegals."

20. Dr. Spiehs intended his June 14 sign to confront what he understood to be public moral disorder and to communicate a Christian moral critique concerning created sex, feminism, immigration priorities, public authority, and national responsibility. Dr. Spiehs's June 14 sign was crude and confrontational, but its purpose and motivation were religious as well as political. Dr. Spiehs intended the sign as religiously motivated public rebuke and public witness.

21. Before ordering Dr. Spiehs to leave on June 14, Defendant Walker observed Dr. Spiehs standing silently with his sign. Dr. Spiehs did not threaten anyone, obstruct passage, interfere with any speaker, prevent the event from proceeding, damage property, or create a safety hazard. Defendant Walker ordered Dr. Spiehs to leave because the event organizer had a permit and because Dr. Spiehs was "against their cause."

22. Defendant Walker's statement confirmed that Dr. Spiehs was not being removed for violence, obstruction, safety, property protection, or disruption, but because his religiously motivated message opposed the permitted event's cause. Defendant Walker thereby compelled Dr. Spiehs to choose between abandoning his religiously motivated witness or facing arrest and criminal consequences. Defendants Byttner, Manker, and Scheibe participated in physically seizing, restraining, arresting, and removing Dr. Spiehs after Walker ordered that he be removed.

23. During that arrest, KHP officers confiscated Dr. Spiehs's sign and treated it as evidence. Defendants' removal, arrest, seizure of Dr. Spiehs's sign, criminal referral, prosecution-related restrictions, and exclusion from Capitol grounds prevented Dr. Spiehs from continuing the religious witness he intended to communicate at the Capitol. Defendants' conduct also curtailed Dr. Spiehs's religious practice of recording and publication by ending his ability to continue documenting the event, his religious message, and the governmental response to his religious expression.

24. Defendants forced Dr. Spiehs to choose between abandoning his religiously motivated public witness or facing physical force, arrest, prosecution, seizure of expressive materials, and exclusion from government property.

**Criminal Penalty, Bond, and No-Capitol Restriction**

25. After the June 14 arrest, Dr. Spiehs was released on recognizance or bond in the criminal-trespass case arising from the June 14 Capitol event. The June 14, 2025 recognizance for appearance identified the charge as "Criminal Trespass" and imposed a release condition stating: "Do not return to 300 SW 10th Ave." The address 300 SW 10th Ave. is the Kansas State Capitol/Statehouse location where Dr. Spiehs had engaged in religious exercise and religious counter-witness.

26. The no-return condition: (1) extended Dr. Spiehs's exclusion from the government facility where he sought to engage in religious exercise beyond the date of arrest; and (2) substantially burdened Dr. Spiehs's religious exercise by excluding him from access to the Capitol grounds, preventing him from returning to continue religious witness at the same public forum, and requiring him to choose between religious exercise at the Capitol and risk of bond forfeiture, arrest, or other criminal consequences.

27. The criminal-trespass charge, release obligation, no-return condition, sign seizure, and prosecution-related restrictions constituted criminal, custodial, and exclusionary penalties imposed after Dr. Spiehs refused to abandon religiously motivated public witness. On or about November 19, 2025, Dr. Spiehs later posted a $1,500 cash bond in Case No. 25-CR-1499.

**Post-Arrest July 2025 Policy: Continuing and Prospective Burdens**

28. The July 2025 Capitol Usage Policy was adopted after the March 28 and June 14 events. Plaintiff does not allege that the July 2025 Policy caused the June 14 arrest. Plaintiff alleges that the July 2025 Policy confirms the nonexclusive public-access nature of Capitol grounds, contradicts Defendants' claimed permit-holder exclusion theory, and continues to impose prospective burdens on Dr. Spiehs's future religious exercise. The July 2025 Policy states that no application will be approved if the applicant limits or restricts "participation in the event" on listed grounds, while separately stating that public access remains nonexclusive and that no application is required merely to come to the Statehouse or grounds. If "participation" means active participation, the Policy burdens Spiehs's religious control over his own event. If it means attendance, the Policy recognizes organizer authority to restrict attendance for nonlisted reasons, including viewpoint.

29. The July 2025 Policy provides that: (1) the Kansas Statehouse and grounds are "open for public use and enjoyment;" (2) all non-legislative meetings, public demonstrations, or outside solicitations require prior written approval only "if the organizer desires to reserve a specific space;" (3) use of public areas is "nonexclusive," so "other members of the public have free access to and may use the Statehouse and/or its grounds during the scheduled time of an event;" and (4) an "Application is not required" for any person or group that merely wishes to come to the Statehouse or grounds and not reserve a specific space.

30. Those provisions confirm that Dr. Spiehs did not need a permit merely to attend, observe, record, and engage in religious counter-witness at the March 28 and June 14 Capitol events. At the same time, the July 2025 Policy continues to burden future religious exercise by requiring prior approval to reserve space for religious meetings, demonstrations, or solicitation; granting the Secretary or designee final discretionary authority to approve, relocate, alter, or cancel events; restricting signs and expressive materials; conditioning approval on the applicant's agreement not to restrict "participation in the event" on specified grounds; authorizing removal or arrest for violations; and permitting bans from the Statehouse for persons who break the law or are deemed safety threats.

31. The July 2025 Policy provides that no application will be approved if the applicant limits or restricts "participation in the event" on the basis of race, color, religion, sex, pregnancy, sexual orientation, gender identity, age, disability, national origin, or genetic information.

32. Defendant Proffitt interprets and continues to interpret the phrase "participation in the event" to prohibit event organizers from declining volunteers, employees, official speakers, performers, or other persons assigned active expressive roles on the basis of the listed classifications. That interpretation substantially burdens Dr. Spiehs's religious exercise by requiring him to surrender control over persons who would speak or act for his religious event.

33. The July 2025 Policy provides that: (1) the Secretary or designee has final authority to approve, relocate, alter, or cancel events and may place restrictions on

events; (2) violations of Statehouse policy, guidelines, or regulations may result in arrest or removal and that individuals may be banned from the Statehouse if they break the law or pose a threat to the safety of others due to prior actions; and (3) KHP may exercise law-enforcement powers to remove or arrest a violator after the Secretary or designee determines that statutes, rules, regulations, or reservation conditions have been violated, or after the ranking KHP official revokes approval based on imminent threat.

34. K.A.R. 1-49-10, attached to the July 2025 Policy, provides that no person may conduct any meeting, demonstration, or solicitation on covered State grounds or buildings without prior permission of the Secretary of Administration or the Secretary's designee.

**Permit-Program Burden, Futility, and Government Benefits**

35. The Capitol event-permit system is a government program and public benefit within the meaning of KPRFA because it provides access to reserved Capitol event space, official event approval, event scheduling, logistical assistance, and recognized use of public Capitol areas. On July 1, 2025, Dr. Spiehs submitted a Capitol event application seeking approval to conduct a religious and political event titled the "No King But Jesus Rally" on July 15, 2025.

36. The proposed rally was intended as a Christian religious assembly and public witness involving preaching, prayer, Scripture reading, religious signs and literature, music or performance, volunteers, and other active participants selected to communicate the event's religious message. On July 8, 2025, Capitol Events

Coordinator Kathleen Williams sent Dr. Spiehs the July 1, 2025 Policy and informed him that he could reply by email with his acknowledgment and agreement to abide by the Policy.

37. The Department thereby conditioned approval of the application and access to the requested Capitol event benefit upon Dr. Spiehs's affirmative agreement to the terms of the July 2025 Policy. Dr. Spiehs replied that he did not agree to the terms of the July 1, 2025 Policy. Approximately eleven minutes later, Williams informed Dr. Spiehs that she would shred the credit-card information submitted for the processing fee and would file his application as "not approved according to the Statehouse Usage Policy."

38. The Department therefore did not merely delay or fail to act upon the application. It affirmatively denied the application because Dr. Spiehs refused to assent to the challenged Policy as a condition of receiving approval. The Policy to which Dr. Spiehs was required to agree included the undefined participation condition, the prior-approval and reservation requirements, broad authority to relocate, alter, cancel, restrict, or waive event conditions, and provisions permitting removal or arrest for Policy violations. Dr. Spiehs could not agree that the Department could require him to surrender religious control over the persons selected to preach, lead prayer, read Scripture, perform, serve as official volunteers, carry official signs, distribute official religious literature, or otherwise communicate the rally's Christian message.

39. By requiring assent to the Policy and denying the application when Dr. Spiehs refused, the Department forced him to choose between acting contrary to his religious

convictions and losing access to the requested government program, reserved space, equipment, services, and organized religious-expression opportunity. That denial constituted the withholding of a governmental benefit, exclusion from a government program, and conditioning of access to a governmental facility because Dr. Spiehs refused to act contrary to his sincerely held religious beliefs. The denial prevented the planned July 15 religious event from occurring at the requested Capitol location and caused the time-sensitive expressive opportunity to expire.

40. The challenged Policy remains in effect. Dr. Spiehs intends to apply for and conduct materially similar Christian events if he can do so without being required to assent to conditions that burden his religious exercise. Requiring him to submit another materially identical application while the same mandatory agreement and challenged conditions remain in effect would subject him to the same choice and likely denial.

**Defendant Proffitt's KPRFA Burdens**

41. Defendant Adam C. Proffitt, as Secretary of the Kansas Department of Administration, has responsibility for the July 2025 Capitol Usage Policy, Capitol event-application system, and the regulatory conditions governing meetings, demonstrations, solicitation, signage, leafleting, event participation, and event permitting on Capitol grounds. Proffitt is sued under KPRFA because he maintains and enforces the current Capitol Usage Policy and attached regulations that continue to burden and substantially threaten to burden Dr. Spiehs's future religious exercise.

42. Proffitt constrains, inhibits, and curtails Dr. Spiehs's religious exercise by: (1) maintaining a prior-permission system under which religious meetings, demonstrations, solicitation, religious signs, religious literature distribution, and religious public witness at the Capitol are conditioned on government approval; (2) withholding or conditioning a public benefit by making the Capitol event-permit program available only on terms that constrain or inhibit Dr. Spiehs's religious exercise; (3) excluding or threatening to exclude Dr. Spiehs from a government program by maintaining permit conditions that deter him from practicing his faith in the Capitol event-permit program for religious assemblies and public religious-witness events: (4) maintaining a policy that, if interpreted to recognize organizer authority over event attendance, allows private permit holders to control who may remain within event areas on Capitol grounds; (5) maintaining a policy that regulates active participation, requires religious event organizers to surrender control over who may actively participate in the event's religious and expressive presentation; (6) maintaining policies restricting leaflets, handouts, signage, and expressive materials used for religious proclamation and public witness; (7) retaining or delegating final discretionary authority over whether religious activity may be permitted, whether events may be relocated, altered, canceled, or restricted, and whether policy provisions may be waived; and (8) maintaining a system under which policy violations, reservation breaches, or discretionary determinations may lead to removal, arrest, bans from the Statehouse, and exclusion from Capitol access.

43. The July 2025 Capitol Usage Policy, K.A.R. 1-49-10, the permit-holder exclusion practice, and the KHP enforcement practices described above remain in effect or remain reasonably likely to recur. Absent declaratory and injunctive relief, Dr. Spiehs faces a substantial likelihood that these policies and practices will again constrain, inhibit, curtail, deny, or penalize his religious exercise at future Capitol events.

**Defendant Smith's KPRFA Burdens**

44. Defendant Erik Smith, as Superintendent of the Kansas Highway Patrol, was responsible for KHP policies, practices, training, supervision, enforcement posture, and operational conduct at Capitol events. Smith constrained, inhibited, and curtailed Dr. Spiehs's religious exercise by: (1) maintaining, permitting, ratifying, or failing to correct a KHP enforcement practice under which officers treated Capitol event areas as if private permit holders controlled access to public grounds; (2) permitting KHP officers to enforce private permit-holder objections against religious counter-speakers through threats of arrest, orders to leave, physical removal, and arrest; (3) allowing KHP officers to convert religious and viewpoint objections by private organizers into State commands enforceable by criminal trespass or interference charges; (4) permitting criminal and custodial penalties to be assessed against Dr. Spiehs when KHP enforced the permit-holder objection system against his religiously motivated witness; and (5) permitting exclusion from access to government facilities when KHP removed, arrested, and caused release restrictions barring Dr. Spiehs from Capitol grounds.

45. KHP had or should have had notice of the March 28 enforcement practice before June 14 through body-camera recordings, event reports, internal reports, supervisory review, complaints, emails, or other KHP records reflecting that officers had treated a permitted Capitol event as private and had enforced a permit-holder objection against Dr. Spiehs's religious counter-witness. Smith failed to correct the March 28 enforcement practice before June 14, thereby allowing the same burdening mechanism to be repeated and escalated into arrest. Smith maintains or permits a policy-and-practice system that chills Dr. Spiehs's future religious witness at the Capitol through the credible threat of repeated removal, arrest, sign seizure, prosecution, bond restrictions, and exclusion.

**Defendant Chavez's KPRFA Burdens — March 28**

46. Defendant Florencio Chavez personally burdened Dr. Spiehs's religious exercise on March 28, 2025. Dr. Spiehs was then engaged in religious counter-witness to satanic religious expression at the Kansas State Capitol. Chavez knew or had reason to know the religious nature of the event and Dr. Spiehs's counter-witness because the event involved satanic religious expression, Dr. Spiehs stood in the area designated for the satanic group, and his sign used religious language concerning blasphemy.

47. Chavez told Dr. Spiehs that: (1) the area was not public because the event had a permit; (2) only persons wanted by the permit holder could remain; (3) the event was private; and (4) arrest for trespass would result if he continued to remain where he was engaged in religious counter-witness. Chavez constrained, inhibited, curtailed,

and denied Dr. Spiehs's religious exercise by: (1) forcing him away from the location and audience he had selected for religious witness; (2) excluding Dr. Spiehs from access to Capitol grounds where he was engaged in religious counter-witness; (3) interrupting his continued ability to record, document, and later publish his religious counter-witness from the place where he intended to continue that witness.

**Defendant Walker's KPRFA Burdens — June 14**

48. Defendant Grady Walker personally burdened Dr. Spiehs's religious exercise on June 14, 2025. Dr. Spiehs was then standing silently on the Capitol steps with signs substantially motivated by his Christian religious beliefs concerning Christ's authority, created sexual order, feminism, immigration, public morality, and national responsibility. Walker observed Dr. Spiehs standing silently with his sign. Walker did not observe Dr. Spiehs threaten anyone, obstruct passage, interfere with speakers, prevent the event from proceeding, damage property, or create a safety hazard.

49. Walker ordered Dr. Spiehs to leave because the permit holder had a permit and because Dr. Spiehs was "against their cause." Walker expressly tied the removal order to Dr. Spiehs's opposition to the permit holder's cause. Walker constrained, inhibited, curtailed, and denied Dr. Spiehs's religious exercise by: (1) converting a private objection to his religiously motivated counter-witness into a State command enforceable by arrest; (2) compelling Dr. Spiehs to choose between abandoning his religiously motivated witness or submitting to arrest and criminal consequences; and

(3) initiating the chain of seizure, force, arrest, sign confiscation, criminal referral, bond restrictions, prosecution-related restrictions, and exclusion from Capitol access.

**Defendants Byttner, Manker, and Scheibe's KPRFA Burdens — June 14 Arrest and Seizure**

50. Defendants Stephen Byttner, Bryce Manker, and Scott Scheibe personally burdened Dr. Spiehs's religious exercise by participating in the enforcement of Walker's order and the permit-holder exclusion mechanism. Defendant Byttner participated in the enforcement chain by seizing, restraining, directing, transporting, preparing paperwork, supplying probable-cause facts, or otherwise helping to remove, arrest, prosecute, or continue restrictions against Dr. Spiehs.

51. Defendant Manker participated in the enforcement chain by seizing, restraining, striking, assisting in restraint, transporting, seizing the sign, failing to intervene, or otherwise helping to remove or arrest Dr. Spiehs.

52. Defendant Scheibe participated in the enforcement chain by seizing, restraining, assisting in arrest, seizing the sign, transporting, failing to intervene, or otherwise helping to remove or arrest Dr. Spiehs.

53. Defendants Byttner, Manker, and Scheibe physically seized, restrained, arrested, and removed Dr. Spiehs from the place where he was engaged in religious witness and thereby constrained, inhibited, curtailed, and denied Dr. Spiehs's religious exercise. Defendants Byttner, Manker, and Scheibe: (1) ended Dr. Spiehs's religious message to the Capitol audience; (2) caused or contributed to criminal and custodial penalties imposed because Dr. Spiehs refused to abandon his religiously motivated public witness; (3) caused or contributed to the confiscation of the sign through which

Dr. Spiehs communicated his religiously motivated message; (4) curtailed Dr. Spiehs's recording-and-publication religious practice by terminating his ability to continue documenting, recording, and later publishing his religious witness and the governmental response to that witness; and (5) that Byttner, and any other defendant who created, supplied, approved, or forwarded reports, affidavits, narratives, or probable-cause information concerning the June 14 arrest, further burdened Dr. Spiehs's religious exercise by causing or prolonging criminal prosecution, bond restrictions, Capitol exclusion, and prosecution-related restrictions arising from his religiously motivated refusal to leave.

**Common KPRFA Burden Allegations**

54. Proffitt is responsible for the upstream policy and permit-program burdens. Smith is responsible for the KHP enforcement-system burdens. Chavez, Walker, Byttner, Manker, and Scheibe are responsible for the event-specific, arrest-specific, prosecution-related, and custodial burdens described above. The overlap among these allegations reflects their different roles in a single policy-and-enforcement chain and does not allege that every defendant committed every act. By the defendant-specific conduct alleged above, each Defendant substantially burdened Dr. Spiehs's religious exercise in the manner corresponding to that Defendant's role in the policy, enforcement, removal, arrest, custody, prosecution, or continuing-exclusion chain.

55. Defendants constrained, inhibited, curtailed, denied, penalized, or chilled Dr. Spiehs's religious exercise by: (1) conditioning religious meetings, demonstrations, solicitation, signs, and public witness on prior government approval; (2) withholding

or conditioning the public benefit of Capitol event access and event permitting; (3) excluding or threatening to exclude Dr. Spiehs from the Capitol event-permit program itself; (4) limiting access to Capitol grounds, Capitol steps, and other government facilities where Dr. Spiehs sought to engage in religious exercise; (5) enforcing private permit-holder objections against religious counter-witness; (6) treating religious counter-witness as removable because it opposed the permit holder's cause; (7) compelling Dr. Spiehs to choose between abandoning religious witness and facing removal, force, arrest, prosecution, bond restrictions, sign seizure, or exclusion; (8) threatening criminal trespass or interference consequences for remaining engaged in religious exercise; (9) physically removing and arresting Dr. Spiehs; (10) seizing the sign used to communicate his religiously motivated message; (11) curtailing his religious practice of recording and publishing his public witness; (12) causing or contributing to criminal and custodial penalties; (13) causing or contributing to bond or release conditions barring return to the Capitol grounds; (14) excluding or restricting Dr. Spiehs from access to government facilities; (15) chilling future religious exercise at the Capitol; and (16) maintaining policies and practices that permit repetition of the same burdens.

56. These burdens were substantial. Defendants did not merely inconvenience Dr. Spiehs's religious exercise. They ended his religious witness at the audience, place, and time he selected; forced him to leave under threat of arrest; physically seized and arrested him; confiscated the sign through which he communicated his religiously motivated message; curtailed his recording-and-publication religious practice;

imposed criminal and custodial consequences; caused bond or release conditions barring Capitol access; restricted access to Capitol grounds and government facilities; chilled access to the Capitol event-permit program; and created a credible threat that the same policy-and-enforcement system will again be used against his religious witness.

57. No compelling governmental interest justified applying these burdens to Dr. Spiehs. At the time of the March 28 removal and June 14 arrest, Dr. Spiehs was not threatening anyone, obstructing access, interfering with speakers, damaging property, preventing the permitted events from proceeding, or creating a safety emergency. Even if Defendants identify a compelling governmental interest in safety, crowd control, property protection, or access management, Defendants did not use the least restrictive means.

58. As a direct and proximate result of Defendants' violations of KPRFA, Dr. Spiehs suffered loss of religious exercise, loss of access to his intended audience, exclusion from government programs, exclusion from government facilities, loss of liberty, arrest, force, seizure of expressive materials, curtailed recording and publication, criminal prosecution, bond restrictions, custodial penalties, humiliation, emotional distress, chilling of future religious exercise, and other actual damages. Dr. Spiehs is entitled to actual damages, punitive damages where authorized, costs, attorney fees, and all other appropriate relief under K.S.A. 60-5303(b).

COUNT II

**Free Exercise Clause—Nonneutral, Non-Generally Applicable, And Discriminatory Treatment Of Religious Exercise 42 U.S.C. § 1983**

(Defendants Chavez, Walker, Byttner, Manker, and Scheibe in Their Individual Capacities, and Defendants Proffitt and Smith in Their Official Capacities)

59. Plaintiff incorporates the preceding allegations.

60. The Free Exercise Clause protects sincerely motivated religious conduct from governmental restrictions that are not neutral and generally applicable. Government action that targets religious exercise, treats comparable secular conduct more favorably, delegates discretionary exemptions, or applies facially neutral rules because of religious hostility or disfavored religious viewpoint is subject to strict scrutiny.

61. Dr. Spiehs's March 28 and June 14, 2025 conduct constituted sincerely motivated religious exercise. He engaged in Christian counter-witness and public religious rebuke through speech, signs, recording, and publication at the Kansas State Capitol. Defendants Chavez and Walker did not enforce neutral rules governing obstruction, violence, safety, or access. They ordered Dr. Spiehs removed because permitted organizers objected to his religiously motivated counter-message, because he was not "with" the permitted group, and because he was "against their cause."

62. Defendants thereby applied the permit system and trespass authority selectively against religious counter-witness while allowing persons favored by the permit holders, including persons communicating the permitted events' messages, to remain in the same public Capitol areas. Defendants Byttner, Manker, and Scheibe knowingly enforced Walker's discriminatory removal order by seizing, restraining,

arresting, and removing Dr. Spiehs, thereby terminating his religious exercise and subjecting him to criminal and custodial consequences.

63. Defendant Smith maintains or permits the KHP practice under which private permit holders' objections to religious counter-speakers may be converted into State removal and arrest commands. Defendant Proffitt maintains the Capitol permit system and July 2025 Policy, including discretionary approval, participation, restriction, removal, and enforcement provisions that burden Dr. Spiehs's present and future religious exercise.

64. The challenged policies and practices are not neutral or generally applicable because they permit individualized and discretionary decisions, empower favored permit holders to trigger enforcement against opposing religious speakers, and treat religious counter-witness less favorably than comparable permitted, secular, or favored expressive activity.

65. Defendants' actions were not narrowly tailored to any compelling governmental interest. Dr. Spiehs was not violent, threatening, obstructive, or disruptive, and Defendants could have addressed any legitimate safety or access concern through neutral and less restrictive measures.

66. As a direct and proximate result, Dr. Spiehs suffered loss of religious exercise, removal, arrest, loss of liberty, prosecution-related restrictions, exclusion from Capitol grounds, emotional distress, and chilling of future religious exercise. Plaintiff is entitled to damages against Chavez, Walker, Byttner, Manker, and Scheibe, and

prospective declaratory and injunctive relief against Proffitt and Smith, together with costs, attorney fees, and all other appropriate relief.

**Count III**
**First Amendment—Facial Prior Restraint, Lack Of Narrow Tailoring, Unbridled Licensing Discretion, And Inadequate Procedural Safeguards 42 U.S.C. § 1983**
**(Defendant Adam C. Proffitt In His Official Capacity)**

67. Plaintiff incorporates all preceding allegations. Defendant Proffitt maintains, administers, and enforces K.A.R. 1-49-10, the July 2025 Capitol Usage Policy, and the Capitol event-application system. He is sued in his official capacity for declaratory and prospective injunctive relief.

68. K.A.R. 1-49-10 requires prior governmental permission before a person may conduct a meeting, demonstration, or solicitation on covered State property. Those activities include protected speech, assembly, petitioning, political advocacy, and religious witness. The regulation is not limited to persons seeking reserved or exclusive space, large events, scheduling conflicts, structures, amplification, obstruction, safety risks, or unusual demands upon State resources. It therefore subjects peaceful, spontaneous, solitary, small-scale, and nonexclusive expression to advance approval.

69. The July 2025 Policy, by contrast, states that an application is unnecessary unless an organizer seeks to reserve a specific space. The regulation and Policy thus provide conflicting standards concerning when advance permission is required, while violations may result in removal or arrest. The licensing system also grants Proffitt or his designee final authority to approve, deny, relocate, alter, restrict, cancel, or

revoke expressive events and to modify or waive Policy provisions without narrow, objective, and definite standards sufficient to prevent arbitrary, content-based, or viewpoint-based decisions.

70. The system contains no definite deadline for acting upon an application, no requirement that adverse decisions be supported by written reasons, and no prompt administrative-review procedure capable of providing meaningful review before a time-sensitive expressive opportunity expires.

71. The challenged system was applied to Dr. Spiehs when the Department required him to agree to the July 2025 Policy as a condition of approval for the “No King But Jesus Rally” and denied the application when he refused. Dr. Spiehs intends to engage in future spontaneous, nonexclusive religious and political expression and to apply for reserved space for organized religious and political events. The challenged regulation and Policy remain in effect and presently chill that intended expression.

72. The advance-permission requirement, conflicting licensing standards, unbounded discretion, and inadequate safeguards violate the First Amendment because they burden substantially more speech than necessary and create a real and substantial risk of arbitrary or viewpoint-based censorship. Plaintiff is entitled to declaratory and prospective injunctive relief prohibiting Proffitt and persons acting in concert with him from requiring advance permission for peaceful, nonexclusive expression by persons seeking no reserved space, administering the licensing system without narrow and objective standards, and issuing adverse licensing decisions without reasonably prompt action, written reasons, and meaningful review.

73. Plaintiff also seeks costs, attorney fees under 42 U.S.C. § 1988, and all other appropriate relief.

**Count IV**
**First Amendment—As-Applied Viewpoint Discrimination And Viewpoint-Based Exclusion—June 14, 2025**
**42 U.S.C. § 1983**
**(Defendants Grady Walker, Florencio Chavez, Stephen M. Byttner, Bryce Manker, and Scott Scheibe in Their Individual Capacities)**

74. Plaintiff incorporates all preceding allegations. The First Amendment prohibits government officials from restricting access to a public forum because of a speaker's viewpoint. That prohibition applies regardless of whether the forum is traditional, designated, limited, or nonpublic.

75. On June 14, 2025, Dr. Spiehs peacefully displayed his religious and political message on the exterior Capitol steps during an event open to the public. He did not threaten anyone, obstruct access, interfere with speakers or equipment, damage property, or create a safety emergency. The event permit did not grant the organizer exclusive possession of the Capitol steps or authority to exclude peaceful members of the public because they opposed the organizer's message.

76. After an event representative objected to Dr. Spiehs and his sign, Defendant Walker ordered him to move because the organizer had a permit and Dr. Spiehs was "against their cause." Walker's stated reason expressly classified Dr. Spiehs by viewpoint. Persons aligned with or acceptable to the permitted cause could remain, while Dr. Spiehs was required to surrender his location, proximity, audience, and communicative opportunity because his message opposed that cause.

77. Defendant Chavez knew the permit-holder exclusion practice from the March 28 incident and knowingly assisted enforcement of the same viewpoint-based mechanism on June 14.

78. Defendants Byttner, Manker, and Scheibe observed or were informed of Dr. Spiehs's sign, peaceful conduct, and the basis for Walker's order. Without identifying an independent viewpoint-neutral ground for removal, they knowingly enforced the discriminatory order by seizing, restraining, arresting, and removing him.

79. Each Defendant personally participated in or caused the denial of Dr. Spiehs's equal access to the Capitol forum. The violation occurred when Defendants conditioned his continued presence upon whether his viewpoint supported or opposed the permitted event's cause. Relocating rather than completely silencing Dr. Spiehs did not cure the violation because Defendants selected him for displacement based on viewpoint. Nor did the organizer's right to control its own speakers, program, volunteers, or official message authorize the State to exclude an independent counter-speaker from public property.

80. No compelling or viewpoint-neutral governmental interest justified the exclusion. Any legitimate concern could have been addressed through neutral rules governing actual obstruction, threats, violence, property damage, event interference, or objectively defined boundaries.

81. As a direct and proximate result, Dr. Spiehs lost equal access to the selected forum, audience, visibility, proximity, communicative impact, recording position, and contemporaneous counter-speech opportunity, and suffered humiliation, emotional

distress, chilling, and other compensable injury. Plaintiff seeks compensatory and nominal damages against each Defendant according to his own conduct and causation, punitive damages where supported, attorney fees and costs under 42 U.S.C. § 1988, and all other appropriate relief.

**Count V**
**First Amendment—State Enforcement Of Private Viewpoint Discrimination And Private Viewpoint Veto**
**42 U.S.C. § 1983**
**(Defendant Adam C. Proffitt in His Official Capacity and Defendant Erik Smith in His Official Capacity)**

82. Plaintiff incorporates all preceding allegations. Defendants maintain and administer a Capitol permit-and-enforcement system under which a private event organizer's objection to an opposing speaker may be converted into a governmental leave order backed by trespass threats, physical removal, arrest, and prosecution.

83. A Capitol permit may protect an organizer's reserved space, stage, equipment, speakers, volunteers, program, and other components of its own expressive presentation. It does not authorize the organizer to exclude peaceful independent speakers from public Capitol areas because of their viewpoint. On March 28 and June 14, 2025, different organizers objected to Dr. Spiehs after observing his opposing message. On each occasion, KHP treated the organizer's objection and permit as authority to exclude him, although no Department official had determined that he violated a permit condition, entered an exclusive area, obstructed the event, or otherwise lacked a lawful right to remain.

84. The repetition of the same mechanism at different events by different KHP officers supports the inference that the exclusions resulted from an ongoing

enforcement practice rather than a single isolated mistake. Defendant Proffitt administers the Capitol permit system and possesses authority to define permit boundaries, reserved uses, enforceable conditions, and the limits of organizer control over public access. Defendant Smith supervises KHP Capitol enforcement and possesses authority to require officers to verify permit scope and identify an independent, lawful, and viewpoint-neutral basis before enforcing an organizer's removal request.

85. The July 2025 Policy confirms that Capitol use remains nonexclusive but does not require officials to distinguish independent counter-speech from participation in an organizer's program, verify the organizer's authority, or identify an independent viewpoint-neutral basis before threatening removal or arrest. Dr. Spiehs intends to attend future permitted Capitol events and engage in peaceful religious witness, political advocacy, recording, journalism, sign display, and counter-speech in areas open to the public. His opposing expression is likely to provoke additional organizer objections, and no binding corrective rule prevents those objections from again becoming State-enforced exclusions.

86. The challenged practice violates the First Amendment because government officials may not coercively enforce a private organizer's viewpoint preference against an independent speaker without an independent lawful and viewpoint-neutral basis. Plaintiff seeks declaratory and prospective injunctive relief requiring Proffitt and Smith, within their respective authority, to distinguish organizer control over its own expressive presentation from independent public attendance and counter-speech,

verify permit boundaries and conditions, and prohibit removal, trespass threats, arrest, citation, preparation of probable-cause materials, or referral for prosecution based merely upon an organizer's viewpoint objection. Plaintiff also seeks attorney fees and costs under 42 U.S.C. § 1988 and all other appropriate relief.

**COUNT VI**
**First Amendment—As-Applied Viewpoint Discrimination and Viewpoint-Based Exclusion—March 28, 2025**
**42 U.S.C. § 1983**
**(Defendant Florencio Chavez in His Individual Capacity)**

87. Plaintiff incorporates all preceding allegations. On March 28, 2025, Dr. Spiehs engaged in peaceful Christian and political counter-speech on the Kansas Statehouse grounds by displaying an opposing sign, observing, recording, and reporting upon the permitted satanic event. Dr. Spiehs did not threaten anyone, obstruct access, interfere with the event's speakers or equipment, damage property, enter an objectively restricted area, or create a safety emergency. No Department official had determined that the permit granted the organizer exclusive control over public attendance or authorized exclusion of peaceful counter-speakers.

88. After organizer Michael Stewart observed Dr. Spiehs's opposing message and objected to his presence, KHP officers classified Dr. Spiehs as "not with" the permitted group. Defendant Chavez then stated that the event was private, that "only people they want in there are allowed there," or words to that effect, and threatened Dr. Spiehs with arrest for criminal trespass if he remained.

89. Chavez thereby made Stewart's acceptance or rejection of Dr. Spiehs the condition of access to the government-controlled forum. Persons acceptable to Stewart could

remain, while Dr. Spiehs was required to leave because his religious and political viewpoint opposed Stewart's message. Chavez identified no independent, lawful, and viewpoint-neutral basis for exclusion. He maintained the arrest-backed departure order after Dr. Spiehs challenged the permit interpretation and asserted that the location remained public property, thereby causing or authorizing his physical displacement.

90. The instruction to "pick a side" did not supply a neutral justification because Dr. Spiehs had selected a physical location. He was excluded because his sign showed that he was not ideologically aligned with Stewart and Stewart did not want him present. Stewart's right to control his own speakers, program, stage, equipment, volunteers, and official expression did not authorize Chavez to exclude an independent counter-speaker from public property. Dr. Spiehs did not seek to participate in or speak for Stewart's event, and his sign unmistakably communicated opposition.

91. Chavez's own statements, observations, arrest threat, continued enforcement, and causation of Dr. Spiehs's displacement establish his personal participation, discriminatory purpose, and proximate causation.

92. As a direct and proximate result, Dr. Spiehs lost equal access to the selected location and audience, suffered impairment of his religious and political expression, observation, recording, reporting, and publication, and experienced humiliation, emotional distress, chilling, and other compensable injury.

93. Plaintiff seeks compensatory and nominal damages, punitive damages where supported, attorney fees and costs under 42 U.S.C. § 1988, and all other appropriate relief, without duplicative recovery.

**Count VII**
**First Amendment—Compelled Speech, Expressive Association, and Unconstitutional Conditions as Applied to Active Expressive Participation**
**42 U.S.C. § 1983**
**(Defendant Adam C. Proffitt in His Official Capacity)**

94. Plaintiff incorporates all preceding allegations. Defendant Proffitt maintains and administers the July 2025 Capitol Usage Policy and event-application system. He is sued in his official capacity for declaratory and prospective injunctive relief. The Policy provides that no application will be approved if the applicant limits or restricts "participation in the event" on specified grounds, but it does not define participation or distinguish public attendance from service as an organizer's official speaker, preacher, prayer leader, performer, representative, volunteer, sign carrier, or literature distributor.

95. This Count challenges the participation condition only to the extent it regulates persons assigned active expressive roles within the organizer's own religious or political presentation. Plaintiff does not claim authority to exclude peaceful attendees, observers, journalists, protestors, or independent counter-speakers from nonexclusive public property. Dr. Spiehs's proposed "No King But Jesus Rally" was an organized Christian assembly involving preaching, prayer, Scripture, religious signs and literature, music or performance, and representatives selected to communicate the rally's message.

96. Persons serving in those roles would reasonably appear to speak or act for the event. Requiring Dr. Spiehs to assign such roles without regard to whether the person can or will communicate the event's Christian message would alter, contradict, dilute, or misrepresent his expression and interfere with his expressive association. The Department required Dr. Spiehs to agree to the Policy as a condition of approving his July 15, 2025 event. When he refused, the Department filed his application as not approved without providing a binding construction excluding active expressive roles from the participation condition.

97. The First Amendment prohibits government from compelling a speaker to incorporate unwanted expression or surrender editorial and associational control as the price of receiving a government benefit. The State may preserve equal public access without controlling who speaks, prays, teaches, performs, distributes official materials, or represents an organizer's own event. The Policy remains in effect, and Dr. Spiehs intends to conduct materially similar religious events. The prior denial and absence of a binding limiting construction create a credible threat that he will again be required to choose between surrendering control over his religious presentation and losing access to the Capitol event program.

98. Plaintiff seeks a declaration and prospective injunction prohibiting Proffitt from interpreting or enforcing the participation condition to require inclusion of unwanted persons in active expressive roles or to deny an application because an organizer selects such participants according to their willingness and ability to communicate the event's message. Alternatively, Plaintiff seeks a binding construction that

"participation in the event" means public attendance and access and does not regulate the organizer's selection of official speakers, preachers, prayer leaders, performers, representatives, or other active expressive participants. Plaintiff also seeks attorney fees and costs under 42 U.S.C. § 1988 and all other appropriate relief.

## Count VIII
## First Amendment—Viewpoint Discrimination Against an Independent Journalist and Newsgatherer—March 28, 2025
## 42 U.S.C. § 1983
## (Defendant Florencio Chavez in His Individual Capacity)

99. Plaintiff incorporates all preceding allegations. On March 28, 2025, Dr. Spiehs and Michael Eravi attended the same public Capitol events, observed and recorded the same governmental conduct, and intended to preserve and publish information concerning the events and KHP's administration of them. During the confrontation, Eravi invoked press or newsgathering status and was permitted to remain and continue recording. Dr. Spiehs also identified himself as a journalist and requested equivalent consideration, but Defendant Chavez maintained the arrest-backed departure order against him.

100. Chavez required neither man to satisfy a written credentialing standard or produce evidence of employment by a traditional media organization. He identified no neutral difference in qualifications, equipment, location, safety, obstruction, or interference with event or police operations that justified treating them differently. The material expressive difference was that Dr. Spiehs displayed the religious and political sign opposed by event organizer Michael Stewart. That sign communicated

Dr. Spiehs's viewpoint but did not prevent him from observing, recording, reporting, or publishing concerning the events.

101. Although the First Amendment does not grant journalists a general right of access unavailable to the public, once Chavez treated press or newsgathering status as a basis for continued access, he could not administer that access according to viewpoint, editorial perspective, political position, or acceptability to the private organizer. Stewart's message-based objection, Chavez's statement that only persons wanted by the permit holder could remain, the differential treatment of Eravi and Dr. Spiehs, and the absence of a neutral journalistic criterion support the inference that Chavez denied Dr. Spiehs equivalent newsgathering access because of his religious, political, and editorial viewpoint.

102. Chavez personally caused the deprivation by maintaining the departure order and causing or authorizing Dr. Spiehs's displacement while permitting Eravi to remain and continue recording. This Count is distinct from Count VI because it requires proof that Chavez afforded Eravi a press-based access consideration but denied equivalent consideration to Dr. Spiehs because of viewpoint. It is pleaded alternatively, and Plaintiff does not seek duplicative recovery.

103. As a direct and proximate result, Dr. Spiehs suffered unequal journalist treatment, loss of newsgathering access and recording position, interruption and impairment of the audiovisual record, impairment of publication, humiliation, emotional distress, chilling, and other compensable injury. Plaintiff seeks

compensatory and nominal damages, punitive damages where supported, attorney fees and costs under 42 U.S.C. § 1988, and all other appropriate relief.

**Count IX**
**Fourth Amendment—Unlawful Warrantless Arrest and Seizure; An Unauthorized Departure Order Could Not Manufacture Probable Cause**
**42 U.S.C. § 1983**
**(Defendants Grady Walker, Stephen M. Byttner, Bryce Manker, Florencio Chavez, and Scott Scheibe in Their Individual Capacities)**

104. Plaintiff incorporates all preceding allegations. On June 14, 2025, Defendants seized and arrested Dr. Spiehs without a warrant and without probable cause for criminal trespass, interference with law enforcement, or any other offense. Before the seizure, Dr. Spiehs stood peacefully on public Capitol grounds. He did not threaten anyone, obstruct access, interfere with the event or police activity, damage property, enter a restricted area, flee, or commit any offense independent of Defendant Walker's departure order.

105. The event permit did not grant the private organizer ownership, exclusive possession, or authority to exclude peaceful members of the public because of viewpoint. No Department official had determined that Dr. Spiehs violated K.A.R. 1-49-10, violated a permit condition, lacked authority to remain, entered an exclusive area, or was otherwise subject to removal.

106. Walker nevertheless ordered Dr. Spiehs to leave because the organizer had a permit and Dr. Spiehs was "against their cause." When Dr. Spiehs peacefully disputed that authority and remained in place, Walker treated his refusal as grounds for removal and arrest.

107. Criminal trespass under K.S.A. 21-5808 required facts showing that Dr. Spiehs knowingly remained without authorization in defiance of an order from an owner or other person actually authorized to control access. The private organizer lacked that authority, and Walker's general law-enforcement status did not authorize viewpoint-based exclusion from nonexclusive public grounds. Interference under K.S.A. 21-5904 required obstruction of an officer who was discharging an independently lawful official duty. Defendants could not create that predicate by issuing an unauthorized order and then treating refusal to obey the same order as interference.

108. Refusal to comply with an order unsupported by lawful authority cannot itself establish probable cause. *See United States v. Romero*, 935 F.3d 1124, 1128–31 (10th Cir. 2019) (obstruction by noncompliance requires refusal of a lawful police command and discussing *Storey*); *Youbyoung Park v. Gaitan*, 680 F. App'x 724, 733–35 (10th Cir. 2017) (unpublished) (an arrest based on disobedience is justified only where the precipitating command was "actually lawful"); *Storey v. Taylor*, 696 F.3d 987, 993–94 & n.6 (10th Cir. 2012).

109. Conduct occurring only after officers initiated physical custody could not retroactively justify the antecedent arrest. Nor did Defendants possess facts establishing any alternative offense before the seizure began. Walker directed and caused the arrest. Byttner, Manker, Chavez, and Scheibe observed or were informed of the permit-based removal order, observed no independent pre-seizure offense, and affirmatively participated in seizing, restraining, arresting, or securing Dr. Spiehs.

Each Defendant personally caused or participated in the warrantless seizure without facts establishing probable cause.

110. As a direct and proximate result, Dr. Spiehs was seized, restrained, handcuffed, removed, transported, booked, subjected to immediate restrictions, publicly humiliated, and deprived of liberty, and suffered emotional distress and other arrest-related damages. Plaintiff seeks compensatory and nominal damages against each Defendant according to his participation and causation, punitive damages where supported, attorney fees and costs under 42 U.S.C. § 1988, and all other appropriate relief.

**Count X**
**Fourth Amendment—Malicious Prosecution and Post-Process Seizure Through Material Misstatements and Omissions Concerning Probable Cause**
**42 U.S.C. § 1983**
**(Defendants Byttner and Walker in Their Individual Capacities)**

111. Plaintiff incorporates all preceding allegations. This Count challenges Defendants' causation of legal process and the resulting post-process seizure, rather than the initial warrantless arrest challenged in Count IX.

112. Defendant Byttner prepared and executed a probable-cause affidavit asserting that Defendant Walker advised him that Dr. Spiehs "needed to be removed from the property," that Dr. Spiehs refused to leave, and that he pulled away while officers attempted to take him into custody. The affidavit omitted that Walker's recorded reason for the departure order was that the organizer had a permit and Dr. Spiehs was "against their cause." It also omitted that the Capitol grounds were open and nonexclusive, the permit granted no viewpoint-based exclusion authority, no

Department official had revoked Dr. Spiehs's privilege to remain, and no neutral violation preceded the seizure.

113. Before executing and submitting the probable-cause affidavit, Byttner's post-arrest investigation established that the event representative concluded Dr. Spiehs did not belong only after observing his opposing sign. Byttner's post-arrest investigation further showed that the event representative concluded Dr. Spiehs did not belong only after observing his opposing sign. She identified no ownership, exclusive possession, Department authorization, obstruction, violence, property damage, or other neutral basis for removal. A corrected probable-cause submission would therefore have shown that the departure order rested upon an organizer's viewpoint objection, not upon authority possessed by an owner or other person authorized to control access. It also would have shown that any alleged pulling or reactive movement occurred only after officers initiated custody.

114. Those corrected facts did not establish probable cause for criminal trespass under K.S.A. 21-5808 because they did not show that Dr. Spiehs knowingly remained without authorization or defied an order from a person actually authorized to revoke his privilege. Conduct arising during the seizure could not supply the missing authorization element or retroactively justify the prosecution.

115. Before the affidavit was filed, Walker conveyed to Byttner the permit-based premise, identified the event representative supporting that premise, and supplied or confirmed information intended for use in the post-arrest investigation and charging submission. Walker materially caused the legal process by making and

directing the criminal-trespass decision, supplying the conclusion that Dr. Spiehs needed removal, identifying the organizer representative, and carrying the defective permit-authority premise into the post-arrest investigation. Byttner gave that premise formal legal effect by preparing and submitting the materially misleading affidavit.

116. On August 6, 2025, the affidavit and criminal charge were filed in State of Kansas v. Justin Paul Spiehs, Case No. SN-2025-CR-001499. he November 13, 2025 arrest occurred pursuant to compulsory process issued in the same criminal case based upon the August 6 charge and supporting probable-cause submission and was required to post a $1,500 cash bond to obtain release. On February 25, 2026, the State moved to dismiss the prosecution for insufficient evidence, the court dismissed the case, and Dr. Spiehs was never convicted. The proceeding therefore terminated in his favor.

117. The omissions, substitution of Walker's unsupported conclusion for the statutory authorization element, use of post-seizure conduct to support the prosecution, and failure to disclose the organizer's sign-based objection support the inference that Defendants acted knowingly, recklessly, and maliciously in causing legal process without probable cause. The prosecutor's charging decision did not break the causal chain because Defendants supplied a materially incomplete and misleading account that prevented an independent evaluation of the missing authorization element.

118. As a direct and proximate result, Dr. Spiehs suffered prosecution, post-process arrest and custody, the cash-bond requirement, compulsory court obligations, loss of

use of bond funds, defense expenses, anxiety, humiliation, reputational injury, emotional distress, and loss of liberty. Plaintiff seeks compensatory and nominal damages against Byttner and Walker according to their respective conduct and causation, punitive damages where supported, attorney fees and costs under 42 U.S.C. § 1988, and all other appropriate relief.

**Count XI**
**Fourth Amendment—Excessive Force and Failure to Intervene During the June 14, 2025 Arrest**
**42 U.S.C. § 1983**
**(Defendants Byttner and Manker for Direct Use of Force, and Defendants Grady Walker, Florencio Chavez, and Scott Scheibe for Direct Participation or Failure to Intervene, in Their Individual Capacities)**

119. Plaintiff incorporates all preceding allegations. This Count challenges the manner of the seizure and is independent of Count IX's challenge to the legality of the arrest. Even assuming solely for purposes of this Count that the departure order and arrest were lawful, which Plaintiff denies, Defendants used more force than was objectively reasonable.

120. Immediately before the seizure, Dr. Spiehs was unarmed, substantially stationary, and suspected only of nonviolent misdemeanor offenses arising from his refusal to leave. He had not threatened, assaulted, struck, kicked, or charged anyone, attempted to flee, reached for a weapon, damaged property, or created an emergency. Several officers were present and had time to give coordinated instructions, secure the sign, designate an arresting officer, conduct a controlled standing handcuffing, or escort Dr. Spiehs from the area.

121. Instead, multiple officers rapidly converged on Dr. Spiehs from different directions while he stood on exterior stone steps and simultaneously grabbed, pulled,

pressed, and controlled different parts of his arms and body without clear sequential instructions. Those tactics restricted Dr. Spiehs's ability to turn, release or reposition the sign, place his hands as directed, maintain his balance, or respond to one officer without contacting another. Any turning, bracing, stiffening, shifting, imbalance, or protective movement was reactive to the officers' simultaneous control and did not constitute an attempt to assault an officer or escape.

122. Defendants used combined leverage, body weight, arm control, and downward pressure to force Dr. Spiehs onto or against the hard stone steps although no weapon, assault, flight, or other emergency required a takedown. During the seizure, Defendant Byttner repeatedly drove or struck his knee into Dr. Spiehs's body while several officers were already surrounding and restraining him. Defendant Manker repeatedly struck Dr. Spiehs in the back with his forearm while Dr. Spiehs was bent or forced downward and physically contained.

123. The strikes were separate applications of impact force rather than incidental contact. Byttner and Manker could observe that Dr. Spiehs was unarmed, outnumbered, not fleeing, and not striking or kicking an officer. Each additional blow required reassessment and exceeded the force reasonably necessary to obtain custody.

124. Walker, Chavez, and Scheibe were present during and participated in or facilitated the seizure. Because the sequence included a takedown followed by multiple distinct blows and continued restraint, each had a realistic opportunity to direct lesser force, announce that control had been achieved, stop later strikes, reduce

continuing pressure, or otherwise intervene but deliberately failed to do so. Each Defendant is liable only for his own direct force, affirmative assistance, or deliberate failure to intervene after a realistic opportunity arose. No Defendant is sued merely because of his presence, rank, or association with another officer.

125. As a direct and proximate result, Dr. Spiehs suffered pain and injury from the knee strikes, forearm blows, takedown, and bodily compression against the stone steps, including bruising, tenderness, soft-tissue and back pain, physical discomfort, fear, humiliation, emotional distress, loss of dignity, and other force-specific injuries. Plaintiff seeks compensatory and nominal damages against each Defendant according to his conduct and causation, punitive damages where supported, attorney fees and costs under 42 U.S.C. § 1988, and all other appropriate relief.

**PRAYERS FOR RELIEF**

A. Declaratory relief under K.S.A. 60-5303(b), 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 1983, as requested in Counts II, III, V, and VII, declaring that the challenged policies, interpretations, practices, and conduct violate Plaintiff's rights under KPRFA and the First Amendment.

B. Prospective injunctive relief against Defendants Adam C. Proffitt and Erik Smith in their official capacities, and against persons acting in active concert or participation with them, as specifically requested in Counts II, III, V, and VII, including relief:

1. prohibiting the State from requiring advance permission for peaceful, nonexclusive expression by persons who seek no reserved Capitol space;

2. requiring narrow, objective, and definite standards governing approval, denial, alteration, relocation, restriction, cancellation, and revocation of Capitol event applications;

3. requiring reasonably prompt decisions, written reasons for adverse decisions, and meaningful review before a time-sensitive expressive opportunity expires;

4. prohibiting State officials from treating a nonexclusive Capitol permit or an organizer's viewpoint objection as authority to remove, threaten, arrest, or prosecute an independent speaker without an independent, lawful, and viewpoint-neutral governmental basis;

5. requiring verification of permit boundaries, conditions, exclusivity, and objectively reserved uses before KHP enforces an organizer's removal request;

6. distinguishing an organizer's control over its own speakers, program, representatives, equipment, and official expression from the rights of the public to attend, observe, record, report, protest, and engage in independent counter-speech; and

7. prohibiting the Department from interpreting or enforcing "participation in the event" to require inclusion of unwanted persons as official speakers, preachers, prayer leaders, performers, representatives, or other active expressive participants, or alternatively requiring a binding limiting construction excluding those active expressive roles.

C. Actual damages under K.S.A. 60-5303(b) against the Defendants legally responsible for the KPRFA violations alleged in Count I, in an amount determined by the trier of fact.

D. Compensatory damages under 42 U.S.C. § 1983 against Defendants Grady Walker, Stephen M. Byttner, Bryce Manker, Florencio Chavez, and Scott Scheibe in their individual capacities, according to each Defendant's conduct and causation, in an amount determined by the jury.

E. Nominal damages as permitted by law for each completed federal constitutional violation for which compensatory damages are unavailable or unproven.

F. Punitive damages under the KPRFA and 42 U.S.C. § 1983 against Defendants Walker, Byttner, Manker, Chavez, and Scheibe in their individual capacities where the evidence establishes evil motive or intent or reckless or callous indifference to Plaintiff's KPRFA and federally protected rights.

G. Prejudgment and post judgment interest as permitted by law.

H. Reasonable attorney fees and costs under K.S.A. 60-5303(b), 42 U.S.C. § 1988, Federal Rule of Civil Procedure 54, and all other applicable authority.

I. Such other legal or equitable relief as the Court determines to be just and appropriate.

DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by Jury on all issues so triable.

/s/Linus L. Baker
Linus L. Baker, KS 18197
6732 West 185th Terrace
Stilwell, KS 66085-8922
Telephone: 913.486.3913
Fax: 913.232.8734
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiff